[Civ. No. 28812. Second Dist., Div. Three. Dec. 1, 1966.]

BOARD OF TRUSTEES OF MOUNT SAN ANTONIO JUNIOR COLLEGE DISTRICT OF LOS ANGELES COUNTY, Plaintiff and Respondent, v. EUGENE CLARENCE HARTMAN, Defendant and Appellant.

758

Herbert W. Selwyn for Defendant and Appellant.

Harold W. Kennedy, County Counsel, and Raymond W. Schneider, Deputy County Counsel, for Plaintiff and Respondent.

FORD, J.—This is an appeal from a judgment permitting plaintiff to dismiss defendant and to terminate his employment as a permanent teacher of the Mount San Antonio Junior College District. The contentions of the defendant are that the matters stated in various charges are barred by the provi-

sions of section 13436 of the Education Code,[1] that the evidence is insufficient to support the findings of fact, that the findings of fact do not sustain the conclusions of law, and that the trial court erred in certain rulings as to the admissibility of evidence. In the light of the record and the governing law we have reached the conclusion that the judgment must be affirmed.

On January 18, 1963, charges were formulated by plaintiff in which it was alleged that causes existed for defendant's dismissal. Written notice of plaintiff's intention to dismiss defendant, together with a copy of the charges, was served upon him. Thereupon defendant demanded a hearing. Plaintiff, pursuant to section 13412 of the Education Code, elected to file this action asking that the superior court inquire into the charges, determine whether or not they were true, and if true, whether they constituted sufficient grounds for his dismissal.

On May 10, 1963, further charges were formulated in like manner, notice of which was given to the defendant, and it was subsequently stipulated that such charges should be deemed to be charges attached to the complaint. Thereafter, pursuant to leave of court, plaintiff filed a supplemental complaint with respect to additional charges which had been formulated by plaintiff on September 3, 1963, and as to which notice had been given to defendant.

The matter was tried and the court determined that the evidence in support of the charge as to the defendant's relationship with a woman, herein designated as Patricia, constituted cause for defendant's dismissal on the grounds of immoral conduct and evident unfitness for service (Ed. Code, § 13403). The court found that at various times, commencing on or about December 12, 1961, and during much of the calendar year of 1962, defendant cohabited with Patricia who was married to a man other than the defendant, that such relationship commenced on the day that Patricia left her husband, that the defendant's wife had died less than 30 days prior thereto, and that Patricia had been a student of defendant at Mount San Antonio Junior College. The court further found that neither Patricia nor defendant "believed in good faith

---

[1]As will be discussed hereinafter, in a prior proceeding judgment was in favor of the defendant. Section 13436 of the Education Code is as follows: "If the judgment determines that the employee may be dismissed, the governing board may dismiss him upon entry of the judgment. Otherwise the employee may not be dismissed as the result of the charges or of any charges which would have been made or heard at the hearing."

that their activities in Tijuana, Mexico, on December 19, 1961, had resulted in that day or at any later time in a valid diforce [*sic*] between Patricia . . . and her husband, or in a valid marriage between defendant and Patricia. . . .''

The trial court further determined that, ''when considered in combination with the actions of the defendant found to be true'' as set forth hereinabove, the relationship of defendant and another woman, herein designated as Frances, constituted cause for the dismissal of defendant on the grounds of immoral conduct and evident unfitness for service. The charge involving Frances which the court found to be true was formulated as follows: ''During the fall of 1960 he lived in an apartment with said Frances . . . under the name of Mr. and Mrs. Hartman. At that time he was married to Barbara Jean Hartman.''

The portion of the findings of fact with respect to the relationship between the defendant and Patricia which the defendant challenges on this appeal is that wherein it was found that neither of them believed in good faith that their activities in Mexico on December 19, 1961, had resulted in a valid divorce between Patricia and her husband and a valid marriage between Patricia and defendant.[2] Reference is made to the receipts for payments with respect to the divorce and marriage proceedings in Mexico and to the testimony of defendant to the effect that what he had read in the newspapers prior to the trip to Mexico indicated that many prominent people obtained Mexican divorces and went through marriage proceedings in Mexico.

Defendant testified that on December 19, 1961, he went with Patricia to an attorney's office in Tijuana and stayed in the waiting room while she talked to the attorney. He gave her $100 in cash to pay to the attorney. The attorney said that they had to go to court for the divorce. They went with him to a building where they were introduced to another man. A portion of defendant's testimony as to what then occurred was as follows: ''A. And then Pat sat down, I sat down and these gentlemen conversed, and they conversed with Pat and they went on for about 20 minutes, I think. . . . A. Most of this conversation was in Spanish. . . . Q. So you didn't understand most of this conversation? A. That's correct. . . . A. She [Patricia] answered questions when they

---

[2]Patricia's husband obtained an interlocutory decree of divorce in California in April of 1962. No contention is made on this appeal that the proceedings in Mexico resulted in either a valid divorce or a valid marriage.

addressed questions to her in English. . . . A. . . . Then when they finished this information, . . . everybody stood up and they handed Pat some papers, and I think they had that retainer receipt, . . . and I asked the gentleman there if that was the divorce and he said, yes, that was the divorce. . . . A. . . . he handed the paper to Pat." As to the conversation in English on that occasion, defendant testified that the only part he could remember was as follows: "Oh, he asked her her name and where she lived, he asked her if her husband had consented to this agreement and she said yes this particular time." Defendant and Patricia then went to see another attorney and defendant asked him what the procedure was for "getting married in this particular state in Mexico." The attorney explained that it was very easy, that "[e]ssentially you simply had to make an affirmation and sign marriage papers." They "got married at that time." Neither defendant nor Patricia informed the lawyer of the divorce proceedings which had just occurred. As to the nature of the "ceremony" defendant testified as follows: ". . . We sat on two sides of the desk there and we signed some papers. We paid the attorney a fee. . . . I believe it was $15. . . . And then after this is over, he said that we were married." In the lawyer's office defendant placed a ring on Patricia's "wedding finger." Late in the afternoon they drove back to California.

Defendant testified that he believed that the date of the Mexican divorce was December 19, 1961. He further testified that prior to that date he had read about Mexican divorces "many times." Part of his testimony was as follows: "I think I read in newspapers that there had been trouble with Mexican divorces at different times. Q. Prior to December 19th, 1961? A. Yes." He separated from Patricia shortly after January 14, 1962. He conceded that he had testified as follows at the time of his deposition: "Q. What was the reason for the separation? A. The reason for the separation was some legal doubt about the validity of the marriage and her anxiety about the custody of her children in terms of this legal doubt." Thereafter, there were times when defendant and Patricia lived together. He testified that early in 1963 he did not separate from her, but he did take a room at Dr. Timmer's house while he was discussing the matter of reinstatement with officials of the college. A portion of his testimony was: "Q. So it is true, is it not, then, that you did move into this address with Mr. or Dr. Timmer because of a question about

the legal validity of your Tijuana marriage to Pat? A. On the part of other individuals, yes. Q. Not in your mind, though? A. That's correct." On April 30, 1963, he married Patricia in Los Angeles in a ceremony performed by a minister. (See Civ. Code, § 79.) As to the circumstances thereof, defendant testified: "Our previous marriage was being challenged by other sides and we wanted to have a clear-cut valid marriage in terms of these doubts that other people had."

The evidence was sufficient to sustain the finding of fact of the trial court that defendant did not believe "in good faith that their activities in Tijuana, Mexico, on December 19, 1961, had resulted on that day or at any later time in a valid divorce between Patricia . . . and her husband, or in a valid marriage between defendant and Patricia. . . ." (Cf. *Miller* v. *Johnson*, 214 Cal.App.2d 123 [29 Cal.Rptr. 251].) The inference as to his state of mind is stronger with respect to the period after the middle of January, 1962, but the defendant continued thereafter to cohabit periodically with Patricia.[3]

Defendant contends that the findings of fact with respect to the relationship between him and Patricia do not support the conclusion of law that such "activities . . . under all the circumstances of this case, constitute cause for the dismissal of the defendant on the grounds of (1) immoral conduct and (2) evident unfitness for service." The argument is in essence that a finding of cohabitation is not a finding that there were sexual relations between defendant and Patricia. In *Boyd* v. *Boyd*, 228 Cal.App.2d 374, at page 381 [39 Cal.Rptr. 400], the court stated: "The accepted California concept of cohabitation is the mutual assumption of those marital rights, duties and obligations which are usually manifested by

[3]In the course of the argument in his brief as to another point, defendant asserts that the record does not contain sufficient support for the finding of fact that defendant's "activity of cohabiting and living with Patricia . . . commenced the day that Patricia . . . left her husband, . . ." Defendant and Patricia rented an apartment on December 14, 1961. Patricia's husband testified that he believed that that was the date of their separation. He further testified that at about 7 o'clock in the morning on the first Saturday after the separation he went to that apartment. As to defendant's appearance the witness testified: "Well, he didn't have his shoes and socks on. . . . He had a pair of pants on. . . . He might have had an undershirt on. I don't remember." Patricia was in bed. It is true that the testimony of that witness was rather ambiguous. But even if there is merit in defendant's attack upon the specific finding, it is clear that the court found that there was cohabitation on and after December 19, 1961. As hereafter set forth in this opinion, under the circumstances of this case that latter finding was sufficient to support the court's determination that there was the requisite cause for defendant's dismissal.

married people, including but not necessarily dependent upon sexual relations.'' But, in any event, under circumstances such as are presented in this case the evil at which the statutory provision is directed is the harmful impression on others, particularly students, arising from the fact of a teacher and a woman to whom he is not married living together openly as man and wife. If adherence to a code of proper personal conduct is not essential in all callings, it is in the teaching profession. (See *Horosko* v. *School Dist. of Mount Pleasant Tp.*, 335 Pa. 369, 371 [6 A.2d 866, 868].) This idea was expressed by Justice Spence in *Board of Education* v. *Swan*, 41 Cal.2d 546, at page 552 [261 P.2d 261] : ''A teacher, and more particularly a principal, in the public school system is regarded by the public and pupils in the light of an exemplar, whose words and actions are likely to be followed by the children coming under her care and protection.''

Apropos are the following statements in the opinion in *Board of Education* v. *Weiland*, 179 Cal.App.2d 808, at pages 811-812 [4 Cal.Rptr. 286] : ''No California case has been called to our attention, and we have found none, which defines 'immoral conduct' as used in section 13521 of the Education Code, and it appears to be appellant's contention that conduct cannot be immoral unless it has some relation to a sexual offense. In *Orloff* v. *Los Angeles Turf Club*, 36 Cal.2d 734, at page 740 [227 P.2d 449], the Supreme Court quotes with approval the following statement from Words and Phrases, permanent edition, volume 20, pages 159-160: 'The term ''immoral'' has been defined generally as that which is hostile to the welfare of the general public and contrary to good morals. Immorality has not been confined to sexual matters, but includes conduct inconsistent with rectitude, or indicative of corruption, indecency, depravity, dissoluteness; or as wilful, flagrant, or shameless conduct showing moral indifference to the opinions of respectable members of the community, and as an inconsiderate attitude toward good order and the public welfare.' . . . As said in *Goldsmith* v. *Board of Education*, 66 Cal.App. 157, 168 [225 P. 783] : '. . . [T]he calling [of a teacher] is so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous that they are incapable of enumeration in any legislative enactment. . . . His habits, his speech, his good name, his cleanliness, the wisdom and propriety of his official utterances, his associations, all are involved. His ability to inspire children and to govern them, his power as a teacher, and the

character for which he stands are matters of major concern in a teacher's selection and retention. . . .' ''

 Defendant contends that the trial court erred in refusing to strike the testimony of Frances introduced by means of her deposition. She was outside the State of California at the time of the trial. The motion was based on the refusal of the witness to answer certain questions in reliance upon the privilege against self-incrimination. The unanswered inquiry was as to whether she told defendant that she had instigated the charges which involved her and that she was going to bring further charges if he did not give her $5,000. It is to be noted, however, that after the motion to strike was denied, not only did defendant testify that Frances had made such a demand upon him for money but a tape recording of a conversation between him and Frances was received in evidence which showed that such a demand had been made by her.

For the reasons which will now be stated we have reached the conclusion that the court's ruling did not result in reversible error. It is, of course, true that a party against whom a witness testifies has the right to test the truth of such witness' testimony by cross-examination, a process which Wigmore has described as being "the greatest legal engine ever invented for the discovery of truth." (5 Wigmore, Evidence (3d ed. 1940) § 1367, p. 29.) But, as stated in *United States* v. *Cardillo* (2d Cir. 1963) 316 F.2d 606, at page 611: ''. . . reversal need not result from every limitation of permissible cross-examination and a witness' testimony may, in some cases, be used against a defendant, even though the witness invokes his privilege against self-incrimination during cross-examination. In determining whether the testimony of a witness who invokes the privilege against self-incrimination during cross-examination may be used against the defendant, a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination. Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him. [Citations.] On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial

danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part, [Citations]." (See *People* v. *Abner,* 209 Cal.App.2d 484, 489 [25 Cal.Rptr. 882]; *People* v. *Robinson,* 196 Cal.App.2d 384, 389-390 [16 Cal.Rptr. 484]; *Smith* v. *United States* (8th Cir. 1964) 331 F.2d 265, 276-277; *Stephan* v. *United States* (6th Cir. 1943) 133 F.2d 87, 97.)

In the present case, however, while the inquiry which was blocked by the claim of privilege bore upon the credibility of Frances, it was of special significance inasmuch as it related to her motive in instigating the very charges in issue as to defendant's conduct with her, the truth or falsity of which the trier of fact had to determine. But in view of the substantial evidence of her motive disclosed to the trial court by means of the tape recording it cannot be said that the defendant suffered prejudice by reason of Miss Watkins' assertion of her privilege against self-incrimination. (See *People* v. *Seitz,* 100 Cal.App. 113, 119-120 [219 P. 1070]; cf. *United States* v. *Smith* (4th Cir. 1965) 342 F.2d 525, 527.)

It is to be further noted that the testimony of Frances as to her occupancy of an apartment with defendant was corroborated by other evidence. Thus, the apartment-house manager testified as to the renting of the apartment by defendant and a woman and that the defendant stated that they were recently married. This occurrence was prior to the death of defendant's wife, Barbara. Defendant testified that a pay check from a business concern payable to "Frances Hartman" bore a signature on the reverse side which "looked like" his signature. Above defendant's endorsement on the check was the following endorsement, "Frances Hartman," followed by the address of the apartment which had been rented to defendant by the apartment-house manager. The assistant personnel manager of the business concern which issued the check testified that records kept in the regular course of business showed that a person who gave a particular social security number was employed by the concern under the name of Frances W. Hartman. That number was the same as that which Frances testified was her social security number.

Other contentions of defendant with respect to rulings as to the admissibility of evidence will be noted only briefly inasmuch as reversible error is not apparent. Thus, defendant complains that the court refused to strike as not responsive an answer of Frances as to when she lived with defendant after

being with him and his wife on Eastern Avenue, the answer being as follows: "That was when he asked me to take an apartment with him on Coronado Avenue." In view of other testimony of Frances, such evidence was hardly more than cumulative in nature.

Another instance to which defendant makes reference arose out of a question addressed to Patricia's husband as to whether, at the time Patricia separated from him, she and he "made any arrangements with respect to her leaving." To that inquiry the witness responded in the affirmative. In over-ruling the objection, the court stated that the testimony would be received solely for the purpose of its bearing upon Patricia's state of mind and that it was subject to a motion to strike if it was not thereafter shown that the defendant had knowledge of that state of mind. Attention is also directed by defendant to another instance when an investigator for the State Board of Education was permitted to testify as to a conversation with Patricia on the theory that it bore upon Patricia's state of mind. A subsequent motion to strike Patricia's statements was denied. If it be assumed that there is some merit in defendant's contentions, a review of the record leads us to the conclusion that it is not reasonably probable that a result more favorable to defendant would have been reached had the challenged evidence been excluded.

 The final ruling as to the admissibility of evidence to be considered consisted of the sustaining of an objection to a question addressed to Patricia's former husband as to whether or not he was charged with contempt of court because of his failure to provide for his children. The argument made is that evidence that defendant supported the children of the witness "was a vital factor to show his good moral character and good faith." The inquiry was as to a collateral matter and the court's ruling did not result in prejudice to the defendant.

The contention remaining for discussion is based upon the provisions of section 13436 of the Education Code. (See foot-note 1 of this opinion.) The language therein used that, if an adverse judgment is not rendered against the employee, "he may not be dismissed as the result of the charges or *of any charges that could have been made or heard at the hearing*" (italics added) lacks the clarity that is desirable in such legis-lation. Some guidance, however, is found in the reasoning of *Fresno City H.S. Dist.* v. *De Caristo*, 33 Cal.App.2d 666, wherein the court stated at page 670 [92 P.2d 668]: "The charges are, in effect, the complaint of the school board against

the teacher. They inform her of the grounds upon which the school board expects to remove her as a permanent teacher. She should be called upon to answer those charges and no others. Clearly, the allegations of the complaint and the issues to be tried and determined by the superior court should be confined to and limited by those written charges. ■ It is apparent from the quoted portion of the code section that the action brought by the school district can have no other purpose than a determination of the legal sufficiency of those charges, their truth or falsity, and their sufficiency to justify a dismissal. The powers of the judge presiding in such a case should be limited to those issues. Ordinarily his findings should not go beyond them.''

The earlier action brought by plaintiff against defendant was filed on February 7, 1962, the pretrial conference therein was held on October 25, 1962, and the case was tried on December 27 and December 28, 1962. In that case judgment was rendered in favor of defendant. That proceeding was based upon charges formulated by plaintiff on December 21, 1961. While such charges did not designate the women involved by name, an examination of the file in that case leads to the conclusion that none of such charges related to defendant's conduct with respect to Frances. The charges involving Frances in the present case do, however, relate to periods of time prior to the formulation of the charges in the earlier case. With respect to Patricia, it does appear that she was the woman involved in the charges in the first case that during the period of July to October of 1961, while he was married, defendant ''had sexual relations on several occasions with a married woman not his wife, who had been a student in a class taught by him in 1960-61 school year in said District,'' that in that period of time he caused the woman to become pregnant by reason of such sexual relations, that on or about November 24, 1961, he attempted to cause her to suffer an abortion by giving her certain capsules for that purpose, and that he made arrangements for an abortion which was performed with respect to such pregnancy. As has been noted, the charges involving Patricia in the case presently before this court relate to defendant's cohabitation with her which is alleged to have commenced on or about December 12, 1961, whereas the charges which formed the basis of the prior case were formulated on December 21, 1961. The record does not disclose that on the latter date plaintiff knew of the events which had occurred in the preceding week.

Under the reasoning of the *De Caristo* case, in the earlier case instituted against defendant the trial court was not at liberty to consider *as a ground of dismissal* conduct of defendant occurring subsequent to December 21, 1961, the date of the formulation of the original charges. (While such evidence of subsequent conduct might be admissible as having evidentiary value with respect to the charges actually before the court, we do not find it necessary to decide that question.) ■ It is true that further charges might have been formulated after the original charges and thereafter brought before the court, as in the present case, by supplemental complaint. However, the filing of such a further pleading is not a matter of right but is subject to the exercise of discretion on the part of the trial court. (See *Holman* v. *County of Santa Cruz*, 91 Cal. App.2d 502, 516 [205 P.2d 767].)

■ Under the circumstances here presented, there was no unfairness in proceeding against defendant in the present action with respect to a new chapter in defendant's relationship with Patricia that had its inception at about the same time as the formulation of the initial charges which formed the basis of the earlier proceeding in court.

As to the charges involving Frances, it is to be noted that the court's determination with respect thereto did not affect its determination that the charges relating to Patricia which were found to be true were, standing alone, sufficient cause for defendant's dismissal. (Cf. *Nelson* v. *Department of Alcoholic Beverage Control*, 166 Cal.App.2d 783, 788 [333 P.2d 771].) But, aside from that matter, our attention has not been directed to any portion of the record which would support a conclusion that plaintiff possessed, or should have uncovered, knowledge of the relationship between defendant and Frances at such a time as to require, in the interests of fairness, a determination that such charges should have been earlier formulated and included in the first action.

The judgment is affirmed.

Shinn, P. J., and Kaus, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 25, 1967.