338 N.W.2d 272 (1983)
215 Neb. 250
James CLARKE, Appellee,
v.
The BOARD OF EDUCATION OF the SCHOOL DISTRICT OF OMAHA, IN the COUNTY OF DOUGLAS, IN the STATE OF NEBRASKA, a political subdivision of the State of Nebraska, Appellant.
No. 44537.
Supreme Court of Nebraska.
September 2, 1983.
*273 David M. Pedersen of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, for appellant.
Theodore L. Kessner of Crosby, Guenzel, Davis, Kessner & Kuester, Lincoln, for appellee.
KRIVOSHA, C.J., and BOSLAUGH, McCOWN, WHITE, HASTINGS, and SHANAHAN, JJ.
KRIVOSHA, Chief Justice.
Appellant, Board of Education of the School District of Omaha (Board), a Class V school district, appeals from an order entered by the District Court for Douglas County, Nebraska, reversing the action of the Board in terminating the employment of one of its permanent teachers, James Clarke. In determining the propriety of the Board's action in terminating Clarke, we must determine whether the act of a teacher calling black students in a racially mixed class "dumb niggers" constitutes "immorality" within the meaning of Neb. Rev.Stat. § 79-1260 (Reissue 1981). The trial court, in reversing the action of the Board, found that Clarke's conduct was insensitive, intemperate, and deplorable, but did not descend to the level of immorality. While we agree completely with the trial court that Clarke's conduct was indeed insensitive, intemperate, and deplorable, we likewise believe that it was immoral within the meaning of § 79-1260, and therefore we must reverse the action of the trial court.
The facts in the case are without dispute. Clarke admitted in writing that while conducting a racially mixed class at McMillan Junior High School on February 24, 1981, he said to several of his black students, who admittedly had been disruptive, "How many times a day do I have to ask you dumb niggers to stop playing around, stop talking and get to work?" Clarke obviously recognized that his statements were inappropriate because, again according to his own written statement, at the conclusion of the class he apologized to the rest of the class, saying, "I am sorry that the rest of the class, especially the three young ladies present, had to listen to this." The following day, Clarke had a further altercation with one of the black students, in which he kicked the chair out from under the student and invited the student to take a swing at him, saying, again according to his written statement, "I wish you would swing at me because then I would have to defent [sic] myself and I would just love to make a black grease spot out of him [sic] on the floor." Both of these events were brought to the attention of the school administration, which confronted Clarke about the events. Clarke admitted to the principal that he had in fact made the statements alleged by the students. In his written statement Clarke conceded that his conduct and comments were inappropriate.
On March 2, 1981, Dr. Ronald Anderson, the assistant superintendent in charge of personnel, suspended Clarke with pay, pending a complete review of the situation. On March 6, 1981, Dr. Anderson, by letter, informed Clarke that he would recommend to the Board the termination of Clarke's teaching contract. Clarke requested a hearing by the Board, which was granted and which took place on March 27, 1981. At that hearing the superintendent of schools took the position that Clarke should be terminated immediately on the ground of immorality. The Board agreed and voted to terminate Clarke's employment immediately for "immorality."
The controversy exists because of restrictions the Legislature has imposed upon the immediate discharge of permanent teachers *274 such as Clarke. Section 79-1260 provides as follows: "Nothing contained in this section shall prevent the suspension from duty of a permanent teacher in a fourth or fifth class school district, pending a decision on the cancellation of his contract. Cancellation of an indefinite contract may be made for (1) incompetency; (2) physical disability or sickness of any type which interferes with the performance of duty; (3) insubordination, which shall be deemed to mean a willful refusal to obey the school laws of this state, the rulings of the State Board of Education, or reasonable rules and regulations prescribed for the government of the schools of the district by the school board; (4) neglect of duty; (5) immorality; (6) failure to give evidence of professional growth; or (7) justifiable decrease in the number of teaching positions or other good and just cause, but may not be made for political or personal reasons. When the cause of cancellation of an indefinite contract is for immorality or insubordination, the cancellation shall go into effect immediately. For all other causes cancellation shall take effect at the end of the current school term. The decision of a school board to cancel an indefinite contract shall be final."
Under the statute the Board could terminate Clarke's contract for a variety of reasons at the end of his current school year but would be required to pay him for the balance of the year even if he did not teach. An immediate termination, however, could be made only for "immorality" or "insubordination." The Board chose not to rely upon "insubordination" but, rather, upon "immorality," and therefore the sole issue presented to us is whether Clarke's actions were "immoral" within the meaning of the statute in question so as to justify immediate termination.
The Board argues that this being an error proceeding, the District Court, in reversing the Board's action, failed to give appropriate weight to the Board's determination that Clarke's conduct was immoral. Generally, in a proceeding in error such as this the order of the administrative body must be affirmed if it acted within its jurisdiction and there is some competent evidence to support its findings. Kennedy v. Board of Education, 210 Neb. 274, 314 N.W.2d 14 (1981); Caniglia v. City of Omaha, 210 Neb. 404, 315 N.W.2d 241 (1982). However, the District Court was required to determine whether the action of the Board was taken in accordance with law. Hollingsworth v. Board of Education, 208 Neb. 350, 303 N.W.2d 506 (1981). In this case the interpretation of the statutory term "immorality" presented a question of law which the District Court was required to determine. See The 20's, Inc. v. Nebraska Liquor Control Commission, 190 Neb. 761, 212 N.W.2d 344 (1973). On appeal, therefore, we are still required to determine whether Clarke's actions in the classroom constituted "immorality" within the meaning of § 79-1260.
In attempting to undertake this task we are not unmindful that we move out into dangerous and uncharted waters. Attempting to determine the limits of a term such as "immoral" is not an easy one. It may be suggested by some that no one, not even a court, should attempt to impose upon others his definition of what is moral or immoral. To accept such an argument would make our task perhaps easier, but would result in this court refusing to accept its responsibility. That we cannot do. In a large measure the task presented to us here is somewhat similar to that which courts have faced when called upon to determine the meaning of the term "obscene." Therefore, the process by which we must determine what is immoral in a given situation is very much like the process we use to determine what is obscene in a given situation, and, as noted by Mr. Justice Stewart in his concurring opinion in Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), may be difficult to define but is obvious on sight.
There is no question that the task presented to us would be made much easier if the Legislature had defined "immorality" as it did "insubordination," when it adopted § 79-1260. Undoubtedly, it did not define *275 the term because, as we have difficulty, so too did it have difficulty in prescribing a limited definition. It is for that reason that we wish to make it clear that our decision here today is not intended to provide an all-inclusive, broad, and general definition of the term "immorality," either generally or within the meaning of § 79-1260, but, rather, only to determine whether, under the facts in this case, Clarke's action was in fact immoral within the meaning of § 79-1260. In attempting to arrive at that answer we must take into account the specific facts presented to us in this case. We must take into account the fact that the school district involved in this case was under a court order to desegregate, and in fact had formally adopted a policy statement on December 3, 1979, which imposed upon all those associated with the Omaha public schoolsstudents, staff, and the general citizenrycertain affirmative obligations. They were in part: "That there be demonstrated, at all times, a respect for others regardless of race, religion, sex, creed, age, personal well being or economic status." Further, "That language of any kind which is disparaging or demeaning to others shall not be tolerated, such as racial, religious, or sexist epithets." The policy statement further called upon staff and students alike to exhibit mature good judgment, respect and sensitivity for others, and warned that violations of the statement would result in disciplinary action being taken, including termination from duty.
Clarke was aware that this was the avowed position of the school district. And yet, with that policy in mind, Clarke nevertheless, in the presence of a racially mixed class, referred to black students as "dumb niggers." That the statement violated the policy of the school district is without question. We likewise believe that it was immoral within the meaning of § 79-1260. We reach that conclusion not just because the language embarrassed and humiliated the black students but because it likewise instructed the white students, by example, that black students could be referred to as "dumb niggers," when in fact they could not. In referring to black students as "dumb niggers," Clarke was teaching white students present in the classroom that it was not inappropriate to refer to blacks as "dumb niggers."
Clarke attempts to explain what he meant by using the term, but his explanation fails. By definition, the term "nigger" is an offensive form of the word "Negro," and is used generally to refer to a black person in a derogatory manner. See Webster's Third New International Dictionary, Unabridged 1968. The term, when used by anyone in referring to a black, is, as the trial court suggested, insensitive, intemperate, and deplorable. But when used by a teacher in the classroom, in the presence of students, it is much more. To "teach" means to show how; to accustom to some action or attitude; to direct, to instruct; to train by precept, example, or experience. See, Webster's Third New International Dictionary, supra; 85 C.J.S. Teach at 1123 (1954); Ex Parte Bernat, 255 F. 429 (W.D. Wash.1918).
As pointed out by the California Supreme Court in the case of Board of Education v. Swan, 41 Cal.2d 546, 552, 261 P.2d 261, 265 (1953): "A teacher ... in the public school system is regarded by the public and pupils in the light of an exemplar, whose words and actions are likely to be followed by the children coming under her care and protection." See, also, Pettit v. State Board of Education, 10 Cal.3d 29, 513 P.2d 889, 109 Cal.Rptr. 665 (1973).
As we have suggested, under these circumstances, it sets an example for others to follow, and as such affects the teacher's ability to teach. Therefore, it becomes immoral within the meaning of § 79-1260.
While § 79-1260 does not limit the act of immorality, we believe it must be read to mean that the act of "immorality" must be directly related to a teacher's fitness to teach. See, Weissman v. Bd. of Educ., 190 Colo. 414, 547 P.2d 1267 (1976); Morrison v. State Board of Education, 1 Cal.3d 214, 461 P.2d 375, 82 Cal.Rptr. 175 (1969); Erb v. Iowa State Board of Public Instruction, 216 N.W.2d 339 (Iowa 1974); *276 Wright v. Superintending Sch. Com., City of Portland, 331 A.2d 640 (Me.1975); In Re Tenure Hearing of Grossman, 127 N.J.Super. 13, 316 A.2d 39 (1974); Mtr. of Jerry v. Board of Educ., Syracuse, 35 N.Y.2d 534, 324 N.E.2d 106, 364 N.Y.S.2d 440 (1974).
While we may not be able to fully and finally define immorality within § 79-1260, we can state that in order for a teacher's conduct to be immoral within § 79-1260 such conduct must be directly related to a teacher's ability to teach, and indicate an unfitness to do so.
The question, more succinctly stated, is whether it is immoral for a teacher to teach white students that it is all right to engage in conduct which is humiliating, painful, and harmful to individuals, which subjects a class of people to public disdain and ridicule, and which is in violation of rules and regulations adopted by the Board for the purpose of putting an end to racial discrimination. Of necessity, such action must be considered to be immoral, just as if Clarke had instructed the students how to cheat on an examination.
To suggest, as urged by Clarke, that immorality within the meaning of § 79-1260 refers to acts involving only physical sexual behavior is to fail to recognize the very function of a teacher or the meaning of immoral. Immorality has a broader, more encompassing meaning. Webster's Third New International Dictionary, supra at 1130, defines "immoral" as "not moral: inconsistent with purity or good morals: contrary to conscience or moral law." In the case of In re Schneider, 12 N.J.Super. 449, 458, 79 A.2d 865, 870 (1951), the New Jersey court, in defining immorality, said: "`Immorality' is not necessarily confined to matters sexual in their nature. In a given context the word may be construed to encircle acts which are contra bonos mores, inconsistent with rectitude and the standards of conscience and good morals. Its synonyms are: corrupt, indecent, depraved, dissolute; and its antonyms are: decent, upright, good, right."
In several cases involving immorality as a basis for termination of a teacher's contract, courts have adopted the following definition: "`"The term `immoral' has been defined generally as that which is hostile to the welfare of the general public and contrary to good morals. Immorality has not been confined to sexual matters, but includes conduct inconsistent with rectitude, or indicative of corruption, indecency, depravity, dissoluteness; or as wilful, flagrant, or shameless conduct showing moral indifference to the opinions of respectable members of the community, and as an inconsiderate attitude toward good order and the public welfare."'" Palo Verde etc. Sch. Dist. v. Hensey, 9 Cal.App.3d 967, 972, 88 Cal.Rptr. 570, 573 (1970). See, Golden v. Board of Ed. of County of Harrison, 285 S.E.2d 665 (W.Va.1981); Board of Education v. Weiland, 179 Cal.App.2d 808, 4 Cal. Rptr. 286 (1960). Immorality is defined in 42 C.J.S. Immorality at 396 (1944) as follows: "An immoral act or practice; any act or practice which contravenes the Divine commands or the social duties; conduct inconsistent with moral rectitude; the state or quality of being immoral; that which is `contra bonos mores;' hence, specifically, unchastity, vice, or wickedness. The term is not necessarily restricted to matters sexual in their nature; but may refer to any course of conduct which offends the moral sense of the community."
And in Horosko v. Mt. Pl't Twp. S. Dist. et al., 335 Pa. 369, 372, 6 A.2d 866, 868 (1939), the Pennsylvania Supreme Court defined "immorality," as it pertained to a teacher, as follows: "We hold it to be self evident that, under the intent and meaning of the [school code], immorality is not essentially confined to a deviation from sex morality; it may be such a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and to elevate." See, also, Orloff v. Los Angeles Turf Club, 36 Cal.2d 734, 227 P.2d 449 (1951).
In the case of Bovino v. Bd. of Sch. Directors of Ind. Area, 32 Pa.Commw. 105, 377 A.2d 1284 (1977), the Pennsylvania Commonwealth Court held that a teacher *277 who referred to a student as a "slut" and "prostitute" in the presence of other students committed an immoral act within the meaning of their tenured teachers act. In doing so the court said: "Bovino, as is readily discernible from the evidence, called the young female student a `slut' and `prostitute.' This language offends the morals of the community and certainly is conduct which does little to foster and elevate the ideals and healthy attitudes the teacher should instill in his students. Such statements are crude and ill-advised when used by a teacher in a public school environment. Thus, we conclude that the determination made by the Secretary that the statements were immoral is well-founded." Id. at 110, 377 A.2d at 1288.
It is difficult to imagine how one can argue in this day and age, in view of the efforts made to eliminate discrimination in this country, that statements by a teacher in referring to black students as "dumb niggers" do not offend the morals of the community. As noted by the Supreme Court of Minnesota in the case of City of Minneapolis v. Richardson, 307 Minn. 80, 88-89, 239 N.W.2d 197, 203 (1976): "We cannot regard use of the term `nigger' in reference to a black youth as anything but discrimination against that youth based on his race.... When a racial epithet is used to refer to a person of that race, an adverse distinction is implied between that person and other persons not of his race. The use of the term `nigger' has no place in the civil treatment of a citizen by a public official." If, indeed, the use of such words does not constitute immorality, we are in greater danger as a country than some even suggest. Laws against discrimination have as their very foundation the notion that it is immoral to racially discriminate against another human, either by deed or by word.
While much to our regret there may have been a time in our history when it was thought appropriate for us to refer to each other as "kikes" or "wops" or "shanty Irish" or "niggers," thankfully we have overcome that disgrace. And those who insist on making such words a part of their vocabulary must be labeled by the public as immoral. For us to take any other position would be to condone such words and action, which no member of this society, let alone a court, should do. Silent indifference to racial discrimination is as much a threat to our society as racial discrimination itself. Either act is immoral in the broader sense.
As noted by the late philosopher and theologian, Abraham Joshua Heschel: "Few of us seem to realize how insidious, how radical, how universal and evil racism is. Few of us realize that racism is man's gravest threat to man, the maximum of hatred for a minimum of reason, the maximum of cruelty for a minimum of thinking." Heschel, The Religious Basis of Equality of OpportunityThe Segregation of God, in Race, Challenge to Religion 56 (M. Ahmann ed. 1963). And, as noted by the bishops of the Roman Catholic Church in the United States in their pastoral letter on racism, Brothers and Sisters to Us 2, 10 (Nov. 14, 1979): "Every form of discrimination against individuals and groupswhether because of race, ethnicity, religion, gender, economic status, or national or cultural originis a serious injustice which has severely weakened our social fabric and deprived our country of the unique contributions of many of our citizens.
....
"As individuals we should try to influence the attitudes of others by expressly rejecting racial stereotypes, racial slurs and racial jokes. We should influence the members of our families, especially our children, to be sensitive to the authentic human values and cultural contributions of each racial grouping in our country."
Whatever may be said concerning the population generally is only magnified when dealing with teachers, who, by example, permanently mold the minds of future citizens.
It is apparent that in singling out immorality and insubordination as two grounds for immediate discharge, while limiting all others to discharge at the end of the school year, the Legislature recognized the important differences. Few would argue that *278 calling young black students in a racially mixed classroom "dumb niggers" is not indecent and shameless conduct showing moral indifference to the opinions of respectable members of the community, and as such offends the moral sense of the community, or that such behavior does not directly affect the teacher's fitness to teach. The acts therefore fit the definition of immoral within the obvious meaning of § 79-1260.
There is no doubt that were we able to declare a broad, all-inclusive definition of immoral, it might be better. But it is apparent that, as in the case of obscenity, immorality will have to be determined on a case-by-case basis. While we may not be able to define all that it is within § 79-1260, we are able to say that the actions of Clarke in this case constituted immorality and that the Board was correct both in its determination and in its action. For reasons stated herein, the judgment of the trial court is reversed and the cause remanded with instructions to reinstate the action of the Board in terminating Clarke's employment immediately.
REVERSED AND REMANDED WITH DIRECTIONS.
SHANAHAN, Justice, concurring.
I concur that the judgment of the District Court must be reversed and that the action of the Board of Education terminating Clarke's contract must be reinstated.
The issue in this case is whether Clarke's conduct is immoral. This conduct consists of a teacher's racial epithets in a public school, that is, referring to pupils as "dumb niggers" and offering to make a "black grease spot" out of a seventh grade student. Such conduct must be evaluated apart from any policy promulgated by the Board of Education, because Clarke is not charged with insubordination and the Board's policy by itself is not a standard of morality.
Chief Judge Virgil Pittman of the U.S. District Court, Southern District of Alabama, placed nigger in societal perspective: "Because of the history of servitude and discrimination against the blacks, the rightfully emerging recognition of their individual dignity, and their pride of race, many blacks are extremely sensitive when whites use this term in any sense." Allen v. City of Mobile, 331 F.Supp. 1134, 1145 (S.D.Ala. 1971).
We must, however, assess the teacher's conduct by some standard other than the sensitivity of one who is the object of the racial slur. We have such a standardone as old as our country itselfnamely: "We hold these truths to be self-evident, that all men are created equal ...." That truth, acknowledged by the Founding Fathers, has to be more than some revered relic dusted off annually which, like the fireworks of the Fourth, fades into national obscurity and is relegated to the recesses of American amnesia. In this case the verbal assault is a page from a racist's handbook: pigmentation determines a person's essential qualities such as intelligence and diminishes or restricts a human being's capabilities. The principle of human equality self-evident in 1776 is still valid and perhaps more vital today. If we forget our past, we must wonder about our future.
As a teacher, Clarke had the duty of educating his students. The etymology of educate requires that a teacher bring forth what is good for the students individually and for society collectively. In Goldsmith v. Board of Education, 66 Cal.App. 157, 168, 225 P. 783, 787 (1924), the role of a teacher was described as "`so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous that they are incapable of enumeration in any legislative enactment.... His ability to inspire children and to govern them, his power as a teacher, and the character for which he stands are matters of major concern in a teacher's selection and retention.'"
Courts have for some time evaluated the conduct of individuals in terms of good faith, bad faith, or similar criteria. In order to warn against proscribed conduct, courts have also defined immorality. "Immorality" is that which is "`hostile to [the] welfare of the general public.'" See Warkentin *279 v. Kleinwachter, 166 Okl. 218, 221, 27 P.2d 160, 163 (1933). Immoral has been defined as "`that which is hostile to the welfare of the general public ... an inconsiderate attitude toward good order and the public welfare.'" Board of Education v. Weiland, 179 Cal.App.2d 808, 811, 4 Cal. Rptr. 286, 288 (1960); Board of Trustees v. Hartman, 246 Cal.App.2d 756, 55 Cal.Rptr. 144 (1966); Palo Verde etc. Sch. Dist. v. Hensey, 9 Cal.App.3d 967, 88 Cal.Rptr. 570 (1970). Immoral conduct has been described as "`an act or acts of a nature likely to jeopardize the interest of the public.'" Lieberman v. Board of Examiners in Optometry, 130 Conn. 344, 346, 34 A.2d 213, 214 (1943). It strains imagination that there could be conduct more hostile to the general welfare of society than that found in the present case.
Clarke's conduct did not occur in a vacuum. His actions took place in a racially integrated classroom of a public school. As expressed in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), "the character of every act depends upon the circumstances in which it is done." Here, in the course of a disagreement with a black student, Clarke's threat to make a "black grease spot" out of a student intensified the violent act of kicking a chair from beneath the pupil. Such unjustified force can hardly be envisioned under any law, civil or moral, as the proper resolution of any dispute. If unprovoked violence and brutal coercion are means to settle differences, then our society has indeed taken a step backward on its trek toward becoming a more perfect system.
The terms moral and immoral are contradictories; they are mutually exclusive and have no middle ground. Clarke's very conduct under the circumstances is a definition of immorality. The mind boggles at characterizing Clarke's conduct as moral. Justice Holmes in Schenck issued the injunction that none shall falsely shout "fire" in a theater. Analogously, no teacher shall yell "nigger" in a racially integrated public school.
The words of George Moore are most appropriate: "After all there is but one racehumanity."
HASTINGS, J., joins in this concurrence.
McCOWN, Justice, dissenting.
The majority opinion contains an eloquent discussion of morality and immorality in an ideal society. The case at hand needs to be placed in proper perspective.
In this case no one questions that Clarke's conduct justified termination of his employment. The conduct was unprofessional and violated a specific policy statement adopted by the school board and imposed upon the teaching staff. Neither is there any doubt that the school board could have suspended Clarke and removed him from duty so long as it continued the payment of his salary.
Neb.Rev.Stat. § 79-1260 (Reissue 1981) authorizes cancellation of a tenured teacher's contract on eight specific grounds. Only when the cause of cancellation of an indefinite contract is for "immorality" or "insubordination" may the obligation to employ and pay salary be canceled before "the end of the current school term." The word "insubordination" is specifically defined in the statute. "Immorality" stands alone without any definition. "Immorality" is the only cause relied on by the board to justify the immediate termination of Clarke's employment and salary.
The only real question in this case is whether or not a tenured teacher who addresses black students in a racially mixed class as "niggers" is guilty of "immorality" within the meaning of § 79-1260 so as to justify immediate termination of employment and of any obligation to pay salary for the balance of the current school term. This court has now held that it does.
There can be no doubt that the imposition of a criminal fine or penalty for immorality under the circumstances here would be unconstitutional because of the fact that the word "immorality" standing alone is vague, indefinite, and uncertain. Even a noncriminal statute is unconstitutionally vague under the due process clause of the fifth or *280 fourteenth amendments when its language does not convey sufficiently definite warning as to the proscribed conduct when measured by common understanding or practice. See, Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).
A noncriminal statute is fatally vague where the exaction of obedience to a rule or standard is so vague and indefinite as really to be no rule or standard at all, or where the standard is written in such terms that "men of common intelligence must necessarily guess at its meaning and differ as to its application ...." Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).
The "conduct" which constituted "immorality" in this case consisted of a teacher using one word, "niggers," to describe and address students. The use of that word by a teacher in a classroom context is the "conduct" which the school board asserts constituted "immorality" sufficient to terminate the teacher's employment and salary immediately.
No person, regardless of the degree of his or her intelligence, could reasonably be expected to know that the use of one unspecified word by a teacher to describe and address students in a classroom might be "conduct" constituting "immorality." Much less could any person be reasonably expected to know which word or words might constitute immorality when uttered because the use of those words in a classroom was generally regarded as immoral conduct by a school board or a community. Such a standard is literally no standard at all and obviously varies from community to community, from school board to school board, and from court to court. If a particular word used by a teacher to describe and address students in a classroom is to be classified as moral or immoral, depending upon community standards, there is virtually no way that a teacher can determine which words are proscribed and which words are not. If the use of one unspecified word is immoral in the classroom, then the use of many other words is also immoral, without regard to whether the word itself is moral or immoral, or neither. The results will vary as widely as individual views of morality.
There is no evidence in this record as to which words are regarded as moral or immoral when used by a teacher in a classroom in any community in Nebraska. The standard of morality may and does vary from community to community. Immorality is a broad term which means widely different things to different people. As the majority opinion points out, pornography may not be readily definable, but it can be recognized when you see it. By analogy it might be said that the majority opinion expresses the view that "immorality" may not be readily definable but it can be recognized when you hear it. The standard is equally vague. If pornography is in the eyes of the beholder, then immorality is in the ears of the hearer in the present context.
It is essential that "immorality" be defined so that it presents a workable, objective standard before the salary of a teacher should be forfeited because an "immoral" word was used in the classroom. This court cannot, under the guise of interpretation, assume to fill in definitions which the Legislature did not spell out. For us to hold, as the majority has now done, that a tenured teacher who addresses black students in a racially mixed class as "niggers" commits an immoral act within the meaning of § 79-1260 in effect has clothed the courts of this state with the power not only to decide what constitutes an immoral act or an immoral word within the concept of a community's accepted standards but also gives courts the power to determine exactly what the accepted standards of morality or immorality in each of the school districts of this state should be.
Traditionally, teachers were held to higher moral standards than society generally. The majority opinion continues that practice. Teachers are entitled to the same constitutional protections afforded to all citizens. In the present case the school *281 board had the right to terminate Clarke's employment. The school board did not have the right to cancel his contract and terminate his salary prior to the end of the 1980-81 school term.
Clarke was guilty of conduct which was "insensitive, intemperate, and deplorable." The use of the deplorable word was also offensive, derogatory, and racist, and it was obviously unprofessional and in violation of direct policy statements of the board. Nevertheless, it did not constitute "immorality" within the meaning of the statute.
The Constitution protects the individual against the tyranny of the majority, whether the majority is the moral majority or the immoral majority. An attempt to ban the use of unspecified words by a teacher in the classroom in the name of morality, under penalty of loss of employment and pay, strikes at the very heart of constitutional liberty.
Clarke's conduct was not "immorality" within the meaning of § 79-1260 so as to authorize immediate termination of his employment and salary by the school board. The judgment of the trial court was eminently correct and should have been affirmed.
BOSLAUGH, J., joins in this dissent.