ANITA DRAIN, APPELLANT, V. BOARD OF EDUCATION OF FRONTIER COUNTY SCHOOL DISTRICT NO. 46, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, AND FRONTIER COUNTY SCHOOL DISTRICT NO. 46, A POLITICAL SUBDIVISION, APPELLEES.

508 N.W.2d 255

Filed November 19, 1993.   No. S-91-420.

Scott Norby, of McGuire & Norby, and, on brief, Rick G. Wade, of Crosby, Guenzel, Davis, Kessner & Kuester, for appellant.

Larry R. Baumann, of Kelley, Scritsmier & Byrne, P.C., for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

FAHRNBRUCH, J.

Anita Drain's teaching contract with Frontier County School District No. 46 was terminated for insubordination and neglect of duty following a 21½-day absence before and after her mother's death.

The district court for Frontier County and the Nebraska Court of Appeals affirmed Drain's dismissal. Drain's petition for further review by this court was granted. We reverse the decision of the Court of Appeals and remand the cause with directions to remand it to the district court for further proceedings and entry of judgment in favor of Drain.

## FACTS

A certified, tenured teacher, Drain had a contract with the Board of Education of Frontier County School District No. 46 (Board) to teach first grade in the Maywood, Nebraska, public schools for the 1989-90 school year. At that time, Drain was beginning her 20th year of teaching in the Maywood schools. On Wednesday, November 15, 1989, Drain requested to be off work the following day to be with her seriously ill mother.

Drain taught on Friday, November 17. She called superintendent Charles Denson on Sunday, November 19, to request additional time off because her mother's condition had not improved.

Drain was absent the following week, which included the Thanksgiving holiday. On Sunday, November 26, Drain was unable to reach Denson by telephone, but called a friend who relayed the message that Drain needed additional time off because her mother was being transferred to another city for tests.

On Thursday, November 30, Drain called Denson and notified him that her mother was scheduled for surgery the next day. Drain's mother died unexpectedly during surgery on Friday, December 1. Drain's former sister-in-law called the school office that same afternoon and left a message informing the school that Drain's mother had died. Drain provided lesson plans for her substitute teacher up through this time, a total of about 2 weeks.

On December 4, Drain's brother, Dennis, advised Denson by telephone that Drain was taking her mother's death hard and that she would not be returning to work until January 8, 1990. During the Board's hearing, Denson admitted on cross-examination that he did not tell Dennis Drain at that time that Drain should contact him immediately, nor did he state that Drain's remaining off work until January 8 was too long a time for Drain to be absent from her position.

On Saturday, December 9, Drain's brother-in-law, Jon Almquist, called the school and talked to the high school principal, Dennis Dolliver. Almquist testified at the hearing that he contacted the school because he had received an anonymous phone call from a Maywood resident who stated there were rumors that Drain's employment was in jeopardy because of her leave of absence. Almquist further testified that when he questioned Dolliver about the rumor, Dolliver responded, " 'Oh, no, we were just having problems concerning what type of leave to put Anita on. We were concerned about establishing a precedent.' " Dolliver testified that he did not recall making that statement, but that he could have made it.

At the time of Almquist's call to Dolliver, Drain and her father were en route to Omaha to fly to Arizona so they could spend the holidays with family members. Almquist testified that he asked Dolliver if he should call Drain back from Omaha

before her plane left and was told that it was not necessary. Almquist stated that he would not have let Drain go to Arizona had he known her employment was in jeopardy, because he knew Drain was dedicated to her job.

On Monday, December 11, Dolliver informed Denson about the phone call from Almquist. The following day, December 12, Denson called Drain in Arizona and informed her that her pay would stop as of December 11 unless the Board received a physician's report identifying what was prohibiting Drain from returning to work. Denson conceded that he did not advise Drain at that time that cancellation of her employment contract was an action which was being considered.

Denson testified that he requested Drain to return to work immediately. Drain testified that Denson did not request a specific date for her return, nor did there seem to be any urgency in his voice. Denson received a letter from Drain on December 26 advising that she planned to return to work on January 2.

Drain returned to work on January 3, 1990. On January 5, Drain provided Denson with a letter from her mother's physician stating that Drain had been absent due to her mother's death. Some time later, Denson advised Drain that the letter did not appear to satisfy the requirements of the Board's policy.

On January 16, Denson mailed Drain a certified letter stating that the Board was considering cancellation of her contract for the following reasons:

Insubordination - Failure to comply with school policy in regard to notification of the principal in advance and preparation of detailed lesson plans for the substitute according to the policy included in the faculty handbook page 12[.]

Insubordination - Failure to comply with a specific request from the superintendent to immediately schedule an appointment with a qualified doctor to examine you and to send a report to the superintendent identifying the reasons you were unable to return to work and detailing the date when you should be expected to return.

Neglect of Duty - Failure to return to duty within a

reasonable period of time and to prepare lesson plans for a substitute to cover the period of absence.

Following a hearing on February 14, the Board canceled Drain's teaching contract on all of the above grounds except insubordination for failing to notify the principal in advance of taking a leave. That finding was not, and is not, an issue on appeal.

Drain's termination was affirmed by the district court and by the Court of Appeals. The effect, in part, of the Court of Appeals' holding is that there was insufficient evidence to find that Drain was insubordinate in failing to provide lesson plans from December 1 to 12 or in failing to submit a letter from a physician. Those findings by the Court of Appeals have not been challenged by the Board. The Court of Appeals did find, however, that there was sufficient evidence for the Board to find that (1) Drain was insubordinate for failing to prepare lesson plans following December 12 and (2) Drain had neglected her duty by taking an "unreasonable" amount of time for family death leave. Drain is before this court on her petition for further review.

## ASSIGNMENTS OF ERROR

Drain contends that the Court of Appeals erred in holding that there existed sufficient competent evidence for the Board (1) to find Drain guilty of insubordination for failing to submit lesson plans and (2) to find Drain guilty of neglect of duty for being absent for an unreasonable period of time in violation of the school district's discretionary leave policy.

## STANDARD OF REVIEW

The standard of review in an error proceeding from an order terminating the contract of a tenured teacher is whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision. See, *Stephens v. Board of Ed. of Sch. Dist. No. 5*, 230 Neb. 38, 429 N.W.2d 722 (1988); *Nuzum v. Board of Ed. of Sch. Dist. of Arnold*, 227 Neb. 387, 417 N.W.2d 779 (1988); *Moser v. Board of Education*, 204 Neb. 561, 283 N.W.2d 391 (1979). The evidence is sufficient as a matter of law if the school board could reasonably find the facts as it did on the basis of the

testimony and exhibits contained in the record before it. *Nuzum v. Board of Ed. of Sch. Dist. of Arnold, supra.*

## ANALYSIS

Preliminarily, we note that Neb. Rev. Stat. § 79-12,112 (Reissue 1987) confers on school boards the power to terminate the employment of permanent, certificated teachers for just cause. Just cause is defined by Neb. Rev. Stat. § 79-12,107(4) (Reissue 1987) to include neglect of duty and insubordination. In the present case, the Board had jurisdiction to terminate a tenured teacher if there was just cause to do so. In the state of the record, the only question before this court is whether the record contains sufficient evidence as a matter of law to support the decision to terminate Drain.

### INSUBORDINATION: FAILURE TO SUBMIT LESSON PLANS

We first turn to the issue of whether Drain's failure to submit lesson plans for the substitute teacher's use beginning December 11, 1989, constituted insubordination. A school district policy entitled "Teacher Absence" provides that "[d]iscretionary leaves which are known in advance . . . require advance notice to the principal and *preparation of detailed plans for the substitute [teacher]*." (Emphasis supplied.) By contrast, the policy states that "[e]mergency leaves (e.g. for illness) require notification of the principal by 7:15 a.m. so that a substitute may be hired. Do not . . . fail to report for work without contacting your principal." The policy makes no mention of a lesson plan requirement for teachers on emergency leave.

It is undisputed that Drain submitted the lesson plans required by the teacher absence policy for her first 2 weeks of absence, or approximately until the time of her mother's death on December 1. It is clear that Drain's leave converted to emergency leave upon her mother's death and that she was not required by the teacher absence policy to prepare lesson plans for that period of time. It is less than clear how long Drain's absence from the classroom continued to be emergency leave, or whether at some point it converted back to discretionary leave.

However, Drain's leave status from that point forward is irrelevant for the purpose of whether Drain was required to

submit lesson plans to her substitute teacher. The substitute teacher who taught Drain's class in her absence testified that she had a discussion about the lesson plans with Drain and told Drain that she would be more comfortable preparing the lesson plans herself on a day-to-day basis. The evidence before the Board fails to reflect that even had Drain prepared the lesson plans, they would have been used by the substitute teacher.

The law does not require the doing of a useless act. See, *Chiles, Heider & Co. v. Pawnee Meadows*, 217 Neb. 315, 350 N.W.2d 1 (1984); *Fink v. Denbeck*, 206 Neb. 462, 293 N.W.2d 398 (1980); *Otteman v. Interstate Fire & Cas. Co., Inc.*, 172 Neb. 574, 111 N.W.2d 97 (1961). After Drain had been told by her substitute that the substitute preferred to prepare her own lesson plans, it would have been a mere formality and a useless act for Drain to have prepared lesson plans. Therefore, under the facts of this case, Drain was not required to prepare and submit the lesson plans, and her failure to do so was not insubordination.

### NEGLECT OF DUTY: ABSENT FOR UNREASONABLE PERIOD OF TIME

Drain also argues that the Court of Appeals erred in finding there was sufficient evidence that she was absent from her teaching position for an unreasonable amount of time or in finding that the time she was absent constituted neglect of duty or just cause for her termination.

At Drain's hearing before the Board, Denson testified that in his "professional opinion," a "reasonable" amount of bereavement leave would be 5 days. The Court of Appeals considered Denson's testimony to be relevant evidence on what constituted a reasonable amount of time for family death leave. The court also took judicial notice that "21 days of leave due to a family death is not a generally accepted practice in this society." *Drain v. Board of Ed. of Frontier Cty.*, 2 NCA 716, 724 (1993). The court then concluded that Drain had neglected her duty by taking an unreasonable amount of leave time.

The Court of Appeals incorrectly held that Denson's testimony on the reasonableness of leave time was relevant, for reasons which we discuss below. The court then compounded

the error by taking judicial notice of the amount of family death leave which it found is generally accepted in today's society.

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Neb. Evid. R. 201(2), Neb. Rev. Stat. § 27-201(2) (Reissue 1989). The decision of the Court of Appeals does not reveal a source whose accuracy cannot reasonably be questioned regarding the subject matter of its judicially noticed fact.

Moreover, because the amount of family death leave which Drain was entitled to take is governed by the terms of her teaching contract with the Board, any professional opinion of Denson's or any fact judicially noticed by the Court of Appeals is irrelevant.

The leave policy in effect at the time of Drain's absence and termination is incorporated by reference into Drain's teacher contract. The second paragraph of that contract states: "The Teacher hereby agrees to be governed by the policies of the Board of Education of the District . . . ." The leave policy had been negotiated by the Maywood Education Association and the Board during the 1988-89 school year, and had been accepted by the teachers. Thus, the leave policy was a policy of the Board as referenced in Drain's contract.

Except insofar as controlled by statute, the validity of a contract of employment of a teacher in the public schools is governed by rules relating to contracts generally. *Greer v. Chelewski*, 162 Neb. 450, 76 N.W.2d 438 (1956); *Spence v. School District*, 121 Neb. 64, 236 N.W. 145 (1931). A contract written in clear and unambiguous language is not subject to construction, and must be enforced according to its terms. *Elson v. Pool*, 235 Neb. 469, 455 N.W.2d 783 (1990). Ambiguity exists in an instrument when a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Metropolitan Life Ins. Co. v. Beaty*, 242 Neb. 169, 493 N.W.2d 627 (1993).

The leave policy is a two-page document with the heading

"LEAVE POLICY," with only one subheading entitled "1. SICK LEAVE." In spite of this characterization, the policy provides for leave for personal illness, illness or death in the immediate family, adoption of a child (including consultation and interviews with adoption agencies), childbirth, and doctor and dental appointments for the employee or the employee's children.

The leave policy states in part:

> Employees shall be entitled to absence *without loss of pay* for personal illness or *for illness or death in the immediate family*. Sick leave shall be granted at the rate of 10 days per year. *Employees will be permitted to carry a maximum of 60 days of unused sick leave forward which will permit a maximum of 70 days of sick leave per year*.

> In order that employees may assist in the event of extreme circumstances, serious illness, or hospitalization of the immediate family, the sick leave shall apply. Immediate family shall be interpreted to mean the father or mother of the teacher or spouse . . . .

> . . . .

> In order to prevent possible abuse of the sick leave policy, employees absent due to illness and using sick leave may be required upon request of the Superintendent of Schools to provide a physicians's [sic] statement that they are unable to perform their duties at school, stating the nature of the illness, and the anticipated date of return to work.

> . . . .

> *If an employee takes time off in excess of sick leave privileges, the sick leave time will be granted but without pay*.

(Emphasis supplied.)

According to the plain terms of the leave policy, employees are entitled to carry forward 10 sick leave days per year, up to a maximum of 70 days of sick leave. Moreover, the policy states *without qualification* that employees are entitled to absence without loss of pay for death in the immediate family. "Immediate family" is defined in the policy to include "mother of the teacher."

The Board and the Maywood Education Association were free to negotiate particular restrictions on the sick leave policy if they chose to do so. For example, the policy restricts to 10 days the amount of sick leave which may be taken by a prospective adoptive parent for consultation, interviews by an adoption agency, and home acclimation following the adoption. The parties could have negotiated a similar limitation on the number of days available to an employee upon the death of a family member. This was not done, nor was there any requirement that the number of days be "reasonable."

The language of the leave policy is clear and unambiguous, and neither the Board nor the courts are free to place a "reasonableness" construction upon the policy as it is written. See *Bedrosky v. Hiner*, 230 Neb. 200, 430 N.W.2d 535 (1988). It is undisputed that Drain had accrued 70 days of paid sick leave at the time of her absence and that she used only $21\frac{1}{2}$ days of leave time during this entire episode. The record shows that Drain, or someone acting on her behalf, repeatedly advised the school of her forthcoming absences in compliance with the teacher absence policy.

That being the case, there is no evidence whatsoever to support the Board's decision to terminate Drain's teaching contract for neglect of duty for being absent an unreasonable amount of time. Drain was merely exercising her right to take paid leave under the negotiated leave policy of her contract with the Board. The decision to terminate this tenured teacher's employment contract was arbitrary and capricious at best, and reprehensible at worst.

Drain is entitled to reinstatement of her teaching contract with backpay and benefits, subject, of course, to mitigation of any damages she has suffered.

## CONCLUSION

There being insufficient evidence to support the Board's decision to terminate Drain's teaching contract for either insubordination or neglect of duty, we reverse the decision of the Court of Appeals and remand the cause to that court. The Court of Appeals is directed to remand the cause to the district court for Frontier County with instructions for further

proceedings and entry of a judgment for Drain not inconsistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.