RODNEY BOSS, APPELLANT, V. FILLMORE COUNTY SCHOOL
DISTRICT NO. 19, A POLITICAL SUBDIVISION OF THE STATE OF
NEBRASKA, APPELLEE.

548 N.W.2d 1

Filed May 14, 1996.   No. A-94-712.

Beverly Evans Grenier, of Scudder Law Firm, P.C., for appellant.

Daniel J. Alberts, of DeMars, Gordon, Olson, Recknor & Shively, for appellee.

SIEVERS, Chief Judge, and MUES and INBODY, Judges.

MUES, Judge.

## I. INTRODUCTION

This is an appeal from a July 1994 judgment of the district court affirming a decision of the Fairmont Public Schools board of education canceling, after 1 year, a 3–year employment contract of superintendent Rodney Boss for school years 1992–93 to 1994–95.

## II. STATEMENT OF CASE

Rodney Boss was hired as the superintendent for Fillmore County School District No. 19 on July 29, 1992. The Fairmont Public Schools board of education (Board) and Boss entered into a 3–year contract, with employment to commence on August 1, 1992, and terminate on June 30, 1995. By notification dated July 30, 1993, Boss was informed that the Board was considering cancellation of his contract, effective immediately. A hearing on the issue commenced August 24 at 7:36 p.m. and continued, with brief intermissions, to approximately 7:30 a.m. August 25. The record made at that hearing consists of 490 pages and 51 exhibits, with 28 witnesses testifying. At the conclusion of the hearing, the Board voted to cancel Boss' employment contract. Boss filed a petition in error in district court on September 21. By a journal entry dated July 5, 1994, the Board's decision was affirmed by the district court. Boss

then sought review by this court. Additional facts will be set forth below as necessary to our decision.

### III. ASSIGNMENTS OF ERROR

Boss asserts that the district court erred in affirming the Board's decision because the Board erred by (1) canceling Boss' contract for reasons beyond the scope of the notice provided Boss and for events which occurred subsequent thereto, in violation of Boss' due process rights; (2) failing to provide Boss a meaningful opportunity in which to respond, in violation of his due process rights, by virtue of the hearing officer's denial of his motion for a continuance; (3) failing to conduct periodic evaluations of Boss as required by Neb. Rev. Stat. § 79-12,111(2) (Reissue 1994); and (4) finding facts sufficient to warrant termination pursuant to Neb. Rev. Stat. § 79-12,110 (Reissue 1994).

### IV. STANDARD OF REVIEW

Because this is a proceeding in error, the task of the district court was, as is ours, to determine whether the Board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision. See, *Drain v. Board of Ed. of Frontier Cty.*, 244 Neb. 551, 508 N.W.2d 255 (1993); *Nuzum v. Board of Ed. of Sch. Dist. of Arnold*, 227 Neb. 387, 417 N.W.2d 779 (1988). Evidence is sufficient as a matter of law if the Board could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it. See, *Drain, supra*; *Nuzum, supra.*

### V. ANALYSIS

Section 79-12,110(1) confers upon the Board the authority to cancel the contract of any certificated employee, including a superintendent, by a majority vote of its members. Thus, the Board acted within its jurisdiction. We next address whether there is sufficient evidence as a matter of law to support the Board's decision, addressed by Boss in his fourth assignment of error, because resolution of this assigned error in Boss' favor effectively makes our analysis of his first three assigned errors unnecessary.

## 1. Facts Sufficient to Warrant Termination

In his fourth assignment of error, Boss alleges that the Board erred by finding facts sufficient to warrant termination. There are two distinct methods by which teaching contracts may be terminated. See, e.g., *Bickford v. Board of Ed. of Sch. Dist. #82*, 214 Neb. 642, 336 N.W.2d 73 (1983). The first is in accordance with the applicable statutes and reasons set forth therein, while the second is by virtue of the teacher's contract for employment. *Id.* Section 79-12,110 sets forth the bases upon which a school board may rely when deciding to cancel a superintendent's contract. Consistent with the bases set forth in § 79-12,110, the Board determined that the cancellation of Boss' contract was warranted based on the following grounds: (1) neglect of duty, (2) incompetency, and (3) unprofessional conduct.

Like § 79-12,110, Boss' contract of employment in this case provides that he may be discharged if he commits any act which substantially inhibits his ability to discharge his duties, including but not limited to any act which displays incompetency, neglect of duty, or unprofessional conduct. Thus, whether we view the evidence as sufficient to support a breach of contract or sufficient to support one or more of the statutory grounds, the result is the same.

Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *State v. Cox*, 247 Neb. 729, 529 N.W.2d 795 (1995); *Anderson v. Nashua Corp.*, 246 Neb. 420, 519 N.W.2d 275 (1994). Similarly, the construction of a contract is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *Larsen v. First Bank*, 245 Neb. 950, 515 N.W.2d 804 (1994); *Rigel Corp. v. Cutchall*, 245 Neb. 118, 511 N.W.2d 519 (1994). In this case, the interpretation of the statutory and contractual terms "neglect of duty," "incompetency," and "unprofessional conduct" presents questions of law. Statutory language is to be given its plain and ordinary meaning. In addition, an appellate court will, if possible, try to avoid a

construction which would lead to absurd, unconscionable, or unjust results. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993); *Coleman v. Chadron State College*, 237 Neb. 491, 466 N.W.2d 526 (1991); *State v. Bartlett*, 3 Neb. App. 218, 525 N.W.2d 237 (1994). Similarly, the terms of a contract are to be accorded their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them. *Murphy v. City of Lincoln*, 245 Neb. 707, 515 N.W.2d 413 (1994); *Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 513 N.W.2d 534 (1994).

We are required on appeal to determine whether Boss' actions constituted "neglect of duty," "incompetency" or "unprofessional conduct" within the meaning of § 79–12,110 and Boss' contract of employment. See, e.g., *Clarke v. Board of Education*, 215 Neb. 250, 338 N.W.2d 272 (1983).

### 2. Neglect of Duty and Incompetency

The first basis for canceling Boss' contract asserts that Boss neglected his duty. The second basis asserts that "Mr. Boss has demonstrated deficiencies or shortcomings in . . . skills . . . ." We interpret the second basis to be that Boss was incompetent. Both bases deal primarily with budget matters, and we will address them together.

The first finding in support of cancellation states:

Mr. Boss has neglected his duty as superintendent of schools by failing to prepare accurate budget and finance documents, by transposing figures inaccurately, by adding figures inaccurately, by failing to follow budget preparation instructions properly, by preparing budget documents and submitting them to board members too late to permit a thorough and proper review of them, by failing to secure the maximum possible reimbursement for chapter 1–related expenditures and by failing to assure that all necessary school supplies were on hand at the beginning of the 1993–94 school year.

The second basis for cancellation is as follows:

Mr. Boss has demonstrated deficiencies or shortcomings in the skills necessary to prepare accurat[e] budget and finance documents including, but not limited to, the

inability to transpose figures accurately, to add figures accurately, to follow budget preparation instructions properly[,] to prepare budget documents properly and to prepare and provide budget documents to board members in a timely mann[er].

■ In adopting § 79-12,110, the Legislature did not define "neglect of duty" or "incompetency." However, Neb. Rev. Stat. § 79-12,107(4) (Reissue 1994) defines the concept "just cause" as it relates to reasons for terminating the contract of a *permanent* certificated employee. "Just cause" includes incompetency and also embraces, inter alia, "neglect of duty." § 79-12,107(4). Incompetency, as there defined, shall "include, but not be limited to, demonstrated deficiencies or shortcomings in knowledge of subject matter or teaching or administrative skills." While neither § 79-12,110 (the statute under which the Board proceeded in this case) nor Boss' contract specifically listed "just cause" as a reason for cancellation, the statutory definition of "incompetency" found in § 79-12,107(4) is instructive. The components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *In re Application of City of Lincoln*, 243 Neb. 458, 500 N.W.2d 183 (1993).

There is no statutory definition of "neglect of duty" in § 79-12,110 or § 79-12,107. However, the meaning of that phrase, within the meaning of § 79-12,110 and Boss' contract, is plain and ordinary. As to both of said grounds, the Nebraska Supreme Court has stated:

Evidence that a particular duty was not competently performed on certain occasions, or evidence of an occasional neglect of some duty of performance, in itself, does not ordinarily establish incompetency or neglect of duty sufficient to constitute just cause for termination. Incompetency or neglect of duty [is] not measured in a vacuum nor against a standard of perfection, but, instead, must be measured against the standard required of others performing the same or similar duties.

*Sanders v. Board of Education*, 200 Neb. 282, 290, 263 N.W.2d 461, 465 (1978). See, also, *Hollingsworth v., Board of Education*, 208 Neb. 350, 303 N.W.2d 506 (1981).

Accordingly, in the context of teacher termination cases, the Nebraska Supreme Court has recognized the importance of evidence regarding the performance of fellow teachers in order to determine whether one's performance has fallen below a particular standard. See, e.g., *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985) (termination upheld where objective formal evaluation used by principal indicated unsatisfactory performance and principal attested to teacher's performance in relation to fellow teachers); *Schulz v. Board of Education*, 210 Neb. 513, 315 N.W.2d 633 (1982) (insufficient evidence to support termination where teacher received above–average evaluations and record was silent as to performance of other teachers); *Hollingsworth, supra* (principal's evaluation of teacher suspect in absence of comparison with other teachers and where previous evaluations were favorable); *Sanders, supra* (insufficient evidence to warrant termination absent evidence regarding other teachers and expert testimony).

Moreover, the Nebraska Supreme Court has recognized the difficulty in ascribing a limited definition to statutory terms involving grounds for termination of certificated teacher employees. Instead, decisions regarding such terms focus on whether, under the facts of the individual case, the employee's actions are sufficient to constitute the specified basis for termination. See, e.g., *Clarke v. Board of Education*, 215 Neb. 250, 338 N.W.2d 272 (1983) (determining whether teacher's action was, under the facts of that case, "immoral" within meaning of pertinent statute); *Schulz*, 210 Neb. at 519, 315 N.W.2d at 637 (stating: " 'There are few, if any, objective criteria for evaluating teacher performance or for determining what constitutes just cause for terminating teaching contracts of tenured teachers. Each case must, therefore, be assessed on its own facts. . .' ").

Boss is not a tenured teacher. He is, by statutory definition, a "probationary certificated employee." See § 79–12,107(3). Despite his "probationary" status, however, Boss is entitled to

the showing of specific grounds before his contract may be canceled pursuant to § 79-12,110 and by virtue of the specific language of his 3-year contract.

Based upon the foregoing principles, we examine the evidence in this case to determine its sufficiency, as a matter of law, to establish either "incompetency" or "neglect of duty" within the meaning of § 79-12,110 and the language of Boss' contractual agreement.

### (a) Budget Errors

Testimony adduced at the hearing reveals that Boss has prepared six budgets during his career. When Boss began as superintendent for Fairmont Public Schools for the 1992–93 school year, 90 to 95 percent of the school budget for that year had already been completed by the former superintendent, Don Pieper.

With regard to accuracy, Pieper attested to several errors committed by Boss. These included (1) publishing an incorrect amount in the 1993–94 notice of budget hearing and budget summary, (2) inaccurately transposing a number from the 1992–93 budget document, (3) committing errors in the draft form of the 1993–94 lid computation document, (4) inaccurately representing an amount in the draft document for the 1993–94 budget, and (5) committing an error in a budget balance expenditure report submitted to the Board. There was also testimony that errors may have existed in the 1993–94 special grant fund list; however, the forms being attested to were never signed and, therefore, never adopted by Fairmont Public Schools or submitted to the Nebraska Department of Education.

With regard to the errors which were proven, we note first that several of the alleged errors were found in draft documents. According to Pieper, documents given to the Board 2 weeks prior to the budget hearing would be considered drafts subject to change. Pieper further testified as to errors contained in draft documents which were later corrected by Boss on his own accord. In fact, Pieper attested to only one error contained in the final budget documents submitted to the Board on August 23, 1993, and he described it as insignificant. Marge Melroy, an administrative assistant at the Phelps County Courthouse,

testified that her office frequently identifies errors necessitating changes in budgets submitted by school superintendents and that it is not uncommon for a budget document to be republished if later amended due to a school board's failure to accept it. Similarly, Joe Reinhart, superintendent of schools at Exeter, testified that he has inaccurately transposed numbers when preparing budgets and that he, at times, has difficulty understanding budget instructions.

■ As previously quoted, "[i]ncompetency or neglect of duty [is] not measured in a vacuum nor against a standard of perfection, but, instead, must be measured against the standard required of others performing the same or similar duties." *Hollingsworth v. Board of Education*, 208 Neb. 350, 360–61, 303 N.W.2d 506, 512–13 (1981). Accord *Sanders v. Board of Education*, 200 Neb. 282, 263 N.W.2d 461 (1978). Many of the errors attributed to Boss by Pieper occurred in draft documents which were subject to change. These errors were discovered and corrected by Boss on his own accord. Pieper did not testify that competent superintendents never make errors in draft budget documents, and common sense suggests otherwise. Pieper described the error as it existed in the final proposed budget documents as insignificant. Reinhart testified that he has inaccurately transposed numbers and had difficulty with budget instructions. As to the published budget, Melroy's testimony suggests that such errors are not uncommon. Thus, we cannot say that Boss' errors were of such a nature as to demonstrate shortcomings unlike those occasionally exhibited by others performing similar duties.

### (b) Budget Timeliness

With regard to the timeliness with which Boss submitted budget documents, final documents were given to the Board 3 days prior to the budget meeting. Minimal changes were made to these documents on the day of the meeting and presented to the Board by a memo explaining the changes and stating that their correction had no effect on the Board's ability to adopt the proposed budget. According to Boss, these changes were not substantive and had no effect on either the percentage of growth in the budget or the property tax requirements. Pieper, while not

disagreeing with Boss' characterization of the nature of the changes, testified that he did not consider it reasonable to present the Board with draft budget documents on August 23, the day of the budget hearing.

Boss argues that the Board improperly relied upon this tardiness when canceling his contract because this omission occurred subsequent to his receipt of the July 30 notice that the Board was considering cancellation of his contract. In support of this argument, Boss cites *Hollingsworth, supra.* In that case, the principal recommended termination of a teacher's contract based on, among other things, the teacher's failure to control his class and inability to handle student misbehavior. According to the principal, the 27 student referrals made by this teacher to the assistant principal for disciplinary reasons were excessive when compared to the number of referrals made by other teachers. The Nebraska Supreme Court reversed the school board's decision and ordered reinstatement of the teacher after determining the evidence was insufficient to warrant termination. In doing so, the court noted that 22 of these referrals occurred subsequent to the request for resignation. Although the record failed to disclose actual knowledge by the student body of the teacher's tenuous position with the administration, the court surmised that the increase in student misbehavior was indicative of such knowledge. We believe the rationale of the *Hollingsworth* court is simply that evidence offered to illustrate an employee's deficiencies must, to be sufficient to support cancellation, causally flow from those deficiencies and not some other source. In *Hollingsworth*, the court implicitly concluded that the excessive disciplinary referrals stemmed not from Hollingsworth's inadequacy, but, more likely, from the actions of students taking advantage of Hollingsworth's tenuous relationship with the school board. Thus, while we do not agree with Boss that *Hollingsworth* stands for the proposition that events occurring subsequent to the notice of possible contract cancellation may never be taken into account by a school board when determining whether to cancel an employee's contract, *Hollingsworth* clearly recognizes that events transpiring after notice of the possible cancellation

of an employee's contract must be critically evaluated as to their cause.

In this case, Boss was notified on July 30 of the possibility that his contract would be terminated. His work on the budget continued because it was in its preliminary stages at that time. On or about August 18, Boss was ordered to vacate his office and not to return to the school during business hours pending his hearing before the Board. Boss testified that he had intended to spend the week of August 16 finalizing the budget in preparation for the Board's August 23 budget meeting. It is reasonable that barring Boss from his office and support staff during this critical time might have contributed to the timing and substance of the budget numbers later used as examples of his neglect of duty and incompetency. Moreover, it is also reasonable to conclude that efforts to prepare for the upcoming August 24 through 25 cancellation hearing demanded time and energy otherwise available to devote to achieving perfection at the budget meeting scheduled to be held on August 23. Under the circumstances, we find the evidence insufficient as a matter of law to support either neglect of duty or incompetency in the timing of presentation of budget matters to the Board.

The remaining evidence as to timeliness indicates that Boss submitted draft documents to the Board on July 21, July 29, and August 9. The budget hearing originally scheduled for August 9 was apparently not held, but there is no evidence that its nonoccurrence was attributable to Boss. Aside from Boss and Pieper, the only other witness with regard to budget matters was Elizabeth Long, a first–year Board member, who candidly admitted that she possessed no experience and only limited knowledge regarding budget matters.

### (c) Chapter 1 Filing

Boss admits failing to timely file an application for "Chapter 1" program improvement funds for the 1992–93 school year. Julie Johnson, the kindergarten Chapter 1 teacher at Fairmont, stated that this missed deadline cost the school between $250 and $3,000, the latter figure apparently referring to an amount for the "Hawaii trip" discussed below. After the deadline was missed, Johnson contacted the Chapter 1 program director and

learned that her planned request to obtain money to attend a conference in Hawaii would have been approved. The Chapter 1 director did not testify. The record is silent as to the impact on the school of Johnson's nonattendance at this conference. The error had no effect on the school's general fund. Boss readily admits that he missed this filing deadline and makes no real effort to excuse this mistake, other than a lack of cooperation, generally, from Chapter 1 personnel and his general unfamiliarity with the Chapter 1 program.

As stated in *Sanders v. Board of Education*, 200 Neb. 282, 290, 263 N.W.2d 461, 465 (1978), "Evidence that a particular duty was not competently performed on certain occasions, or evidence of an occasional neglect of some duty of performance, in itself, does not ordinarily establish incompetency or neglect of duty sufficient to constitute just cause for termination." That Boss missed this filing deadline is undisputed. However, given the lack of any evidence that this omission impacted the Chapter 1 program at Fairmont Public Schools and the negligible effect it had on Chapter 1 funds, together with the lack of evidence that Johnson's failure to attend the Hawaii conference negatively impacted the Chapter 1 program, we conclude that, in the language of *Sanders*, this conduct was minimal rather than substantial evidence of incompetence or neglect of duty.

### (d) School Supplies

Boss received no notice in the July 30 letter that he was being charged with the failure to have all necessary school supplies on hand at the beginning of the 1993–94 school year. The Board's finding in this regard is, moreover, wholly unsupported by the evidence.

### (e) Conclusion Regarding Incompetency/Neglect of Duty

Thus, there is no question that the evidence in this case supports a factual finding that the *draft* budget documents presented by Boss contained errors, that the figure which he published in the newspaper was incorrect, that the final budget document contained an insignificant error, and that he missed the Chapter 1 filing deadline. The issue before us is not whether there is evidence to support those factual findings, but whether those findings are sufficient, as a matter of law, to constitute

neglect of duty or incompetency under § 79–12,110 or the terms of Boss' contract. Based upon our foregoing discussion, we conclude that they are not sufficient. The purpose of a proceeding in error, such as the one before us, is to remove the record from an inferior to a superior tribunal so that the latter tribunal may determine if the judgment or final order of the inferior tribunal is in accordance with law. *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985). While the appellate standard of review in such cases is limited, the Nebraska Supreme Court has frequently reversed school board decisions upon finding the evidence insufficient to warrant a finding of neglect of duty or incompetence.

For example, in *Schulz v. Board of Education*, 210 Neb. 513, 315 N.W.2d 633 (1982), the court found the evidence that a teacher was described on evaluations as cold and distant toward pupils and that parents complained that children were overworked insufficient as a matter of law to warrant a finding that the teacher was "incompetent." Similarly, in *Sanders, supra*, the Board's decision to terminate a tenured teacher's contract was reversed because the evidence was found insufficient to show neglect of duty or incompetence. In that case, the teacher was accused of leaving the drill team unsupervised, allowing students to roam the halls, having disciplinary problems, and mishandling various equipment. The superintendent testified that in his opinion, the teacher's failure to supervise the drill team constituted neglect of duty. The Nebraska Supreme Court, however, categorized this conduct as minimal rather than substantial evidence of incompetence or neglect of duty. Accordingly, the decision to terminate was reversed. Cf., *Eshom, supra* (finding of incompetence upheld where teacher failed to maintain control of class, lacked teaching skills, failed to use her voice properly, demonstrated emotionality in correcting students, used incorrect English and grammar, and used inadequate variety of materials and individualized instruction); *Bickford v. Board of Ed. of Sch. Dist. #82*, 214 Neb. 642, 336 N.W.2d 73 (1983) (neglect of duty and unprofessional conduct shown where guidance counselor failed to register senior students for necessary graduation requirements, failed to contact students' parents, and

lied to principal about said failures); *Kennedy v. Board of Education*, 210 Neb. 274, 314 N.W.2d 14 (1981) (just cause shown where principal failed to maintain discipline, had become ineffective in relations with staff, had failed to cooperate with the board on several occasions, and had refused to cooperate in police investigation regarding stolen school property).

We are mindful of the teachings of the Supreme Court that the question of whether a school employee's actions warrant termination must be decided on a case–by–case basis. Considering the aforementioned facts, not in a vacuum, but, rather, in relationship to what the evidence shows others charged with similar duties have done, and with respect to the impact on the school district, we find that such errors are minimal and insufficient to establish incompetency or neglect of duty under § 79–12,110 or Boss' contract.

### 3. UNPROFESSIONAL CONDUCT

The third basis for Boss' dismissal states as follows:

> Mr. Boss has behaved in an unprofessional manner in violation of policy GAAB regarding his behavior toward Julie Johnson by touching her and by his comments to her. Mr. Boss has behaved in an unprofessional manner by putting his arm around some female students in a way that some teachers who observed the incidents found to be unprofessional[.] Mr. Boss's treatment of some patrons and of board membe[r] Elizabeth Long have [sic] made it difficult, if not impossible, for them to continue to work with Mr. Boss. And may have prompted some parents to file a complaint with the office of civil rights.

The term "unprofessional conduct" is undefined in § 79–12,110. Similarly, no definition of that term appears under the statute addressing "just cause." § 79–12,107(4). Faced with a similar lack of definition, the Supreme Court in *Clarke v. Board of Education*, 215 Neb. 250, 338 N.W.2d 272 (1983), concluded that conduct sufficient to constitute "immorality" must be directly related to a teacher's fitness to teach. Likewise, we conclude that "unprofessional conduct," as used in § 79–12,110 and in Boss' contract, must be conduct directly related to Boss' fitness to act as a superintendent. In *Scott v.*

*State ex rel. Board of Nursing*, 196 Neb. 681, 691, 244 N.W.2d 683, 690 (1976), the Nebraska Supreme Court, in defining unprofessional conduct in the context of a nursing licensure act, concluded that it was " ' "conduct which violates those standards of professional behavior ·which through professional experience have become established, by the consensus of the expert opinion of the members, as reasonably necessary for the protection of the public interest." ' "

"Unprofessional conduct" as applied to teachers is defined in part in 68 Am. Jur. 2d *Schools* § 161 at 470 (1993) as "conduct that violates the rules or the ethical code of a profession or that is unbecoming a member of a profession in good standing, or which indicates a teacher's unfitness to teach."

Other jurisdictions have used similar definitions with regard to teachers. In *Morris v. Clarksville–Montgomery*, 867 S.W.2d 324, 329 (Tenn. App. 1993), the court, quoting from Black's Law Dictionary 1707 (4th ed. 1951), stated:

> "UNPROFESSIONAL CONDUCT. That which is by general opinion considered to be grossly unprofessional because immoral or dishonorable. *State Board of Dental Examiners v. Savelle*, 90 Colo. 177, 8 P.2d 693, 697. That which violates ethical code of profession or such conduct which is unbecoming member of profession in good standing. *People v. Gorman*, 346 Ill. 432, 178 N.E. 880, 885. It involves breach of duty which professional ethics enjoin. *People v. Johnson*, 344 Ill. 132, 176 N.E. 278, 282."

After citing the general definition from 68 Am. Jur. 2d, *supra*, the *Morris* court concluded:

> The phrase, "unprofessional conduct" is to be construed according to its common and approved usage having regard to the context in which it is used. *Bd. of Educ. of City of L.A. v. Swan*, Cal.1953, 261 P.2d 261, 41 Cal.2d, 546 [overruled on other grounds].
>
> Unprofessional conduct means conduct indicating an unfitness to teach. *Morrison v. State Board of Education*, 1 Cal.3rd 214, 461 P.2d 375, 82 Cal.Rptr. 175 (1969).

867 S.W.2d at 330.

In *Perez v. Commission on Prof. Competence*, 149 Cal. App. 3d 1167, 1174, 197 Cal. Rptr. 390, 395 (1983), a limited definition of "unprofessional conduct" was adopted, based on the following rationale:

> We conclude unsatisfactory teacher performance said to be unprofessional conduct should be measured by the standard of fitness to teach. Absent this objective measure of performance, the livelihood of the teacher is dependent upon an abstract characterization of conduct which will shift and change from board to board, district by district and year by year. Such discretion is required to be bridled by the restraints of the standard of fitness to teach.

> We hold the phrase "unprofessional conduct" (as used in the pertinent statute which did not define it) is conduct such as to indicate unfitness to teach.

By distilling the foregoing, we conclude that unprofessional conduct of a superintendent under § 79–12,110 and Boss' contract includes such conduct as is, by general opinion or, when necessary, by the opinion of appropriate professionals, immoral, dishonorable, unbecoming a member in good standing in the profession, or violative of professional codes of ethics or professional standards of behavior. In addition, such conduct must indicate an unfitness to act as a public school superintendent.

### (a) Julie Johnson

With regard to the first allegation of unprofessional conduct by Boss, policy "GAAB" sets forth the personnel policy of Fairmont Public Schools regarding sexual harassment. It prohibits, among other things, verbal or physical conduct of a sexual nature in various specified contexts. The record is void of any evidence that Boss' actions toward Johnson, complained of at the hearing, were sexual in nature. We believe that Boss' actions and comments toward Johnson, as described by her, are more fairly characterized as arrogant, annoying, insensitive, or obnoxious—certainly not traits which would endear one to others, regardless of their sex, but at the same time, not sexual in nature. Indeed, Johnson stated that she did not view Boss' comments or actions as sexual in nature. Rather, she variously

described Boss' behaviors as "strange," "inappropriate," and "bizarre," and said they made her "uncomfortable." Therefore, to the extent that the Board found Boss violated the policy against sexual harassment, such finding is unsupported by the evidence. However, we further examine this and the other findings of the Board to determine whether they are supported evidentially and, if so, whether they constitute "unprofessional conduct" within the purview of § 79-12,110 or the language of Boss' contract.

The following are examples of "inappropriate" behavior attested to by Johnson: (1) Boss "always" put his arm around her shoulders or came up behind her and "rub[bed]" her neck for a few seconds; (2) Boss "sort of chuckled," offered to be a male model, and told Johnson how big his muscles were when he was a football coach; (3) Boss once introduced Johnson to another person by saying "this is our Julie"; (4) Boss referred to Johnson as "cheap"; (5) when Johnson would go into the teachers' lounge, Boss would say "hi, Julie and how are you"; (6) while Johnson was in a store in Lincoln with Boss, Boss told a clerk that Johnson was "with me"; (7) while traveling to a conference in Lincoln, Boss reached over and started "shaking" Johnson's knee approximately five times while conversing with her; (8) while they were in Boss' office, a song came on titled "What Part of No Don't You Understand?" and Boss told Johnson that it reminded him of her; and (9) Johnson received a note in her mailbox about a conference in South Dakota with a note stating "[S]hould we go?"

With regard generally to Boss' "touching" of people, several staff members, both male and female, testified that it was Boss' manner to occasionally touch their shoulder or pat their knee during conversation. It did not seem inappropriate to them or in any way sexual in nature. A female office staff person testified that Boss' touching her bothered her. When she informed Boss of this, he stopped.

Boss explained that when he introduced Johnson by saying "this is our Julie" to a fellow administrator, he did so because that person also had a person named "Julie" on his staff. With regard to Boss' references to Johnson as "cheap," testimony adduced at trial reveals that the former superintendent, Pieper,

also referred to Johnson as "cheap" because when she was hired, Johnson had taught only 1 year, had only 6 hours at that time, and her pay rate was low. It was Johnson herself who informed Boss of this previously used term and its meaning as used by Pieper. Although the term was not offensive when used by Pieper, Johnson testified that *she* began to interpret Boss' use of the term to mean that she was of loose morals. No others were called to support a similar interpretation by them of such language as used by Boss in referring to Johnson.

Johnson testified that she stopped going to the teachers' lounge before school, according to her, "[b]ecause it seemed like every time, no matter how many people were in the room — and I didn't know if this was just Mr. Boss being friendly, I didn't know how to perceive it, but he had to make, you know, hi, Julie and how are you." Johnson, however, admitted that she may have been misconstruing Boss' congeniality toward her.

With regard to the incident in the store in Lincoln, Johnson testified that a store clerk assisting Boss asked Boss to wait while the clerk asked Johnson if she needed any help. To this, Boss responded that Johnson was "with me."

The incident involving the "shaking" of Johnson's knee occurred in a car while Boss and Johnson traveled to Lincoln to attend a conference. According to Johnson, while conversing, Boss grabbed and shook her knee approximately five times. While this activity is an unusual way of getting a point across, particularly to a female colleague in a professional setting, even Johnson did not perceive it as sexual. Rather, Johnson's stated reaction to this was "[t]he first couple of times I thought, I'm not a 12 year old kid here and sort of leave me alone." The inference is that Boss was emphasizing some point to Johnson by this "shaking" maneuver and that Johnson objected to her being lectured as if she were a child. As stated above, other testimony indicates that Boss regularly touched people in various ways, including male staff members, when conversing with them. While perhaps unorthodox to some, in the absence of evidence of ignored protests by Johnson, we are hard pressed to view it as constituting conduct sufficient to cancel Boss' contract, even though Boss was apparently insensitive to the gestures' potential effect on Johnson.

Boss testified that his statement to Johnson that the song entitled "What Part of No Don't You Understand?" reminded him of her meant simply that Johnson was continuously requesting his approval of financial assistance for the Chapter 1 program, to which Boss regularly said "No." At the time the statement was made, even Johnson had no idea what was meant and did not imagine anything inappropriate about it until some time later when a friend told her that it was the title to a song wherein a female was spurning the romantic advances of a male suitor. Johnson, obviously surmising that Boss' comment was alluding to her rejection of his advances, then concluded that Boss' prior conduct toward her had been inappropriately motivated. There is no evidence that Boss made romantic advances toward Johnson or that she ever rejected or protested his comments or conduct.

Finally, regarding the South Dakota conference information to which Boss attached a note stating "[S]hould we go?" Johnson testified that after receiving this note in her mailbox, she went to Boss' office and informed him that she and another teacher would attend. Boss responded by asking who invited the other teacher. Johnson then asked Boss if he was suggesting that the two of them attend this conference together, to which Boss replied no. Several inferences might be drawn from this scenario, the most damning of which is that he was flirting with Johnson.

Johnson made no contemporaneous complaints to Boss that his actions or comments were unprofessional or inappropriate. Indeed, no complaints from Johnson surfaced until solicited in connection with the cancellation proceeding. While Johnson's subordinate status might arguably explain her silence, there is no evidence that she feared retaliation, and it is clear from the balance of the record that Johnson felt little, if any, sense of intimidation in her professional and personal dealings with Boss. Boss expressed surprise and apology over Johnson's testimony and stated that now being aware of Johnson's feelings, he would avoid any comment or act which might offend.

While we do not condone Boss' comments or actions, or minimize in any way the discomfort which they caused Johnson, Boss' conduct toward Johnson did not constitute "unprofessional

conduct" within the meaning of § 79-12,110 and Boss' contract. While it may reflect insensitivity and personality traits that Johnson found juvenile and distasteful, there is no opinion evidence, lay or expert, that the conduct was immoral, dishonorable, or violated professional standards or ethics. The conduct described did not indicate unfitness to serve as an administrator of a public school. Johnson testified that it would be difficult for her to continue to work with Boss if he remained superintendent. Whether this feeling stems from the tension created by her testifying at the Board hearing or from Boss' prior conduct toward her is unclear. In any event, that Johnson expressed this sentiment is not a basis for cancellation in view of the evidential shortcomings here.

### (b) Female Students

As to Boss' conduct of putting his arm around female students, Johnson was again a prime complainant on this topic. No female students or parents of students testified to any problems in this regard. According to Johnson, Boss "always" seemed to "just put his arm around [a student] — I mean, he wouldn't hug her, he would just sort of squeeze her, put his arm around her and give her a squeeze." Johnson also observed Boss, on one occasion, rubbing the back of a female student. Johnson's statement that Boss "always" did this was contradicted by her later testimony that she saw this conduct with only two students. Johnson's description of this conduct varied from "[v]ery unprofessional, totally uncalled for" to "inappropriate."

Several staff and faculty members testified that they had never witnessed inappropriate behavior of Boss toward any students. Some testified that they had observed Boss put his arm around the shoulders of female students. One such faculty member recalled being present when Boss gave a female student a "hug" which caused the witness and another faculty member present to have "eye contact." In the witness' opinion, although not sexual in nature, this conduct was "inappropriate." However, he also stated that whether *he* would ever engage in similar conduct would depend "on the situation." Interestingly, the other male faculty member witnessing the same incident

described Boss' conduct in placing his arm "around the shoulder" of the female student as "not inappropriate," although "it's not something you see every day." This faculty member's recollection was that "I believe it had something to do with an injury and something to the effect, well, you're going to get better soon. It was kind of a consoling thing, that was my interpretation of it." Still a third male faculty member described an incident of Boss' placing his arm around the shoulders of a female student as inappropriate and not something he would have done. At the same time, he did not interpret it as sexual, but, rather, as a "gesture of friendship and caring."

Yet another faculty member, who testified that she had never seen Boss do anything unprofessional, acknowledged that she had seen him touching a senior girl. She explained:

> She was hurt and he's a coach, he's like a father figure, and it was nothing more than that. I really didn't feel it was sexually expressed or anything like that, it was concern. I mean it's ex[c]iting to see an administrator who really cares for the kids one–on–one that way.

As was the case with Boss' comments and actions toward Johnson, no one ever complained to Boss and told him that his "touching" of female students was unprofessional or inappropriate until he received the July 30 letter. We reiterate that, as was the case with Johnson, there is no evidence that Boss' conduct toward any of the female students was sexual in nature.

In today's litigious climate, one might suggest that Boss' conduct and the images it might convey to suspicious minds lacked prudence. On the other hand, one might say, as did one faculty member, that it is "ex[c]iting to see" such an expression of care. In any event, under the circumstances here, such conduct is not "unprofessional" under any definition. Expressions of friendship, caring, and consolation hardly demean a profession whose very function includes support and care of children as they proceed through the educational process.

### (c) Elizabeth Long

In support of the third example of unprofessional conduct, Elizabeth Long, a member of the Board, testified that it was difficult for her to work with Boss. She attributed this difficulty to her *feeling* that Boss always "minimizes her concern"; however, she also stated that she had "always been well received" by Boss. Long also stated that Boss has never been rude to her. Long further testified that she had heard from several teachers that Boss had made a negative statement about her at a staff meeting. When she confronted Boss about this, he denied having made any such statement. No further evidence was adduced regarding the alleged statement. It is not the court's function to second-guess school boards; nevertheless, the Legislature clearly intended to afford teachers and administrators "some protection from . . . angry school boards." *Schulz v. Board of Education*, 210 Neb. 513, 518, 315 N.W.2d 633, 637 (1982). This evidence is not proof of unprofessional conduct, and unless Long's *feelings* were confirmed by evidence, the matter is of little significance and certainly not a basis for termination.

### (d) Treatment of Parent Grievances

The last example of unprofessional conduct as stated by the Board is, inter alia, that Boss' "treatment of some patrons . . . *may* have prompted some parents to file a complaint with the Office of Civil Rights." (Emphasis supplied.)

It is important to note that the Board did not find that Boss' treatment of any patron *in fact* caused the filing by any parent of complaints with the "Office of Civil Rights" (OCR). The Board carefully restricted its finding to "may." A review of the evidence shows that such a restricted finding was judicious on the part of the Board, because the evidence is wholly insufficient to support anything more than "may."

Two parents testified at the hearing. The first was Debra Swanson and the second, Linda Bristol. Swanson, along with her husband, made the OCR filings. The mother of two school-age children, one a fifth grader with special education needs, Swanson testified as to no less than six separate complaints or "grievances" which she had leveled against the

Fairmont Public Schools during Boss' first year as superintendent. While the OCR complaints are not before us, they apparently involved at least two of the six alleged incidents. One centered on an incident of alleged physical abuse of her daughter by another student, and the other pertained to the school's Developing Capable People (DCP) program. Swanson testified that she filed these OCR complaints not because the response she had received was unfavorable to her, but, rather, out of sheer frustration in getting no response from Boss. The record defies this.

The incident involving physical abuse of Swanson's daughter was investigated by Boss on the very day it was brought to his attention by Swanson and her husband. Boss did so in spite of the fact that the principal, Kenton McLellan, was assigned to handle disciplinary problems within the schools. In response to the Swanson complaint, Boss immediately interviewed their daughter and the other girl involved. He also spoke to the teacher involved, as well as the principal. This was on a Friday. The following Monday, he delivered a memorandum to Swanson in which it was determined that both girls had denied there was any incident. Swanson testified that she had "extreme difficulty" with the way Boss conducted the interviews, and she characterized the results of his investigation as containing "numerous untruths" which were never "resolved" by Boss. She informed Boss of these things and on that same Monday advised him of "the details of our NOCR complaint."

Thus, while Swanson pretends that the OCR complaints resulted from a lack of resolution rather than from her dissatisfaction with the response she received, her actions speak louder than her words. Her decision to proceed with at least one of such complaints was obviously made over a period of 2 or 3 days, and then only upon being obviously dissatisfied with the prompt response.

When asked what Boss could or should have done to have changed Swanson's course of action regarding the filing of the OCR complaints, she was unable to give any definitive response. When asked by the Board's counsel whether Boss' handling of the matter might have affected her filing of the complaints, the most Swanson could muster was "[t]hat's very

possible." On the evidence before us, no reasonable person could conclude that Boss alone was the cause of these OCR complaints being filed.

Swanson's son was also the subject of an OCR filing. Again, the nature of the filing is not apparent from the record, but the complaint to the schools involved a "class meeting" exercise which was part of the DCP program. Swanson objected to one of the class meetings because an agenda item for the meeting involved a matter relating to her son's special education program. Boss initially refused to remove the agenda item, but later did direct the teacher who was conducting the class meeting to skip that agenda item. The evidence contains letters from McLellan to Swanson pertaining to her son and his special education needs and the school's attempts to work with Swanson regarding complaints in this regard. Swanson's complaints did not fall on deaf ears, as her testimony suggests. While Swanson directed her requests to Boss and while Boss did not personally respond to all of them, McLellan did respond in apparent good faith, at times after consulting with Boss.

Without detailing the balance of Swanson's complaints and each and every one of Bristol's complaints, suffice it to say that in each instance they were addressed by Boss, McLellan, or both. These complaints ranged from Boss' flippant reaction to Bristol's phone call asking Boss to check on the status of the school bus because it was 25 minutes late to Swanson's filing of a "grievance" because her initial request to review certain telephone bills was not honored by Boss' secretarial staff. Boss and McLellan later wrote to Swanson and apologized and explained that the staff had not known that they had permission to allow the review of the telephone bills and offered Swanson the opportunity to review them during business hours, which she never did. Both Swanson and Bristol were part of a larger group of parents who voiced objections to the DCP program. This resulted in formal parent meetings and in Boss' altering of the program with recommendations from this parent group. No further problems with regard to the DCP program have been reported.

In conclusion, placing responsibility for Swanson's filing of the OCR complaints on Boss, under the circumstances of this

case, borders on the absurd. That Boss mishandled the complaints of Bristol and Swanson is not proved merely by the fact that Swanson ultimately filed OCR complaints or by the fact that Swanson and Bristol rendered complaints. There was no evidence offered that any other superintendent would have handled these complaints differently or that Boss' conduct rose to the level of "unprofessional conduct."

As stated in *Schulz v. Board of Education*, 210 Neb. 513, 315 N.W.2d 633 (1982), the Legislature, by setting forth certain standards that must be met before contracts can be canceled, clearly intended to afford some protection to school personnel from disgruntled parents, as well as angry school boards. We do not believe that the complaints of two parents out of the entire school district on matters such as those addressed by Swanson and Bristol provide substantial evidence to support a finding sufficient to cancel a superintendent's contract on the grounds of unprofessional conduct.

### (e) Periodic Evaluations

Boss argues that the cancellation of his contract was a nullity because he was not evaluated during his first year of employment with the school district as mandated by § 79-12,111. Boss' argument characterizes this as a deficiency in evidence which, in a jury trial setting, would mandate a directed verdict in his favor. The school district argues, alternatively, that Boss was "evaluated" at every school board meeting, thus meeting the evaluation requirement, and that even if no evaluations were made, it does not preclude the cancellation.

Section 79-12,111 provides that all probationary certificated employees employed by Class I, II, III, and VI school districts shall be evaluated at least once each semester. If the probationary certificated employee is a superintendent, he or she shall be evaluated twice during the first year of employment and at least once annually thereafter. *Id.* While the record does not reflect the class of the school district involved, the district does not argue that the statute is inapplicable because the district is of an exempted class or that the statute suffers from any equal protection or special legislation

infirmity. See *Nuzum v. Board of Ed. of Sch. Dist. of Arnold*, 227 Neb. 387, 417 N.W.2d 779 (1988). "Probationary certificated employee," for purposes of § 79-12,111, means superintendents, regardless of the length of service. Neb. Rev. Stat. § 79-12,107(3). We conclude that Boss is within the ambit of § 79-12,111, and as such, as a superintendent, he was entitled to be evaluated twice during the first year of employment with the school district. The question is whether such evaluations were performed and, if not, whether that failure precludes cancellation of his contract.

The district argues that evaluations were performed, because Boss met with the Board a minimum of 15 times within a year and received direction and feedback from the Board members during these meetings. It argues that this, in effect, fulfilled the evaluation mandate of § 79-12,111. We disagree. The statute expressly provides that should the evaluation disclose deficiencies in the work performance of any probationary employee, the evaluator "shall provide the teacher or administrator at the time of the observation with a list of deficiencies, a list of suggestions for improvement and assistance in overcoming the deficiencies, and followup evaluations and assistance when deficiencies remain." As stated by Justice Caporale in *Nuzum, supra*:

> It is clear from § 79-12,111 as a whole, without the need to resort to other sources, that its purpose is to compel school system managers to engage in a specified process of evaluating all probationary certified employees, identify such skill and performance areas in which the employee needs to improve, provide suggestions for and assistance in making those improvements, and eliminate from the system those who cannot become competent.

227 Neb. at 394, 417 N.W.2d at 784.

School board meetings do not provide the "specified process" of evaluating required by § 79-12,111. We do not infer from the occurrence of the meetings that any such evaluation of Boss was performed.

We now move to what effect the failure to provide periodic evaluations to Boss has on the right to cancel his contract under either § 79-12,110 or the terms of his contract. Neither the

statute nor his contract expressly prohibits cancellation for this omission. Boss argues that *Nuzum* stands for the proposition that the failure to show compliance with § 79-12,111 is fatal to the cancellation of his contract. *Nuzum*, however, is distinguishable in that *Nuzum* involved the failure of the board to renew a probationary contract of employment, whereas the school district's action in this case was one to *cancel* Boss' 3-year contract. This difference is significant in that a board may decide not to renew a probationary contract "for any reason it deems sufficient [so long as constitutionally permissible]," § 79-12,111(4), whereas the contract of a certificated employee may be *canceled* during the school year only upon those grounds shown in § 79-12,110. In the latter instance, a formal due process hearing is required, Neb. Rev. Stat. § 79-12,115 (Reissue 1994), whereas in the former, no such hearing is mandated, § 79-12,111(8) and Neb. Rev. Stat. § 79-12,116 (Reissue 1987).

Thus, while noncompliance with the periodic evaluations of § 79-12,111 may negate a school board's decision not to renew a probationary contract, it is not so clear that the failure to provide those evaluations has the same effect on a board's decision to cancel a certificated employee's contract under § 79-12,110. We find no Nebraska Supreme Court cases which have directly addressed this issue.

The school district proffers the policy argument that such a construction would, by necessity, unreasonably preclude the cancellation of a superintendent's contract even for the most egregious of conduct, such as the commission of a crime, if he or she had been denied the periodic evaluations under § 79-12,111. This unnecessarily distorts the issue. We believe if faced with this issue, our Supreme Court would construe §§ 79-12,110 and 79-12,111 in such a manner as to avoid such an absurd, unconscionable, or unjust result. See, e.g., *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993). Thus, the failure to provide periodic evaluations to a superintendent should not, in every instance, preclude cancellation of a contract under § 79-12,110. On the other hand, statutory language is to be given its plain and ordinary meaning, and § 79-12,111

plainly mandates superintendent evaluations. We must attempt to harmonize these statutes and to give effect to each.

We conclude that if the ground for cancellation is a deficiency in the performance of an administrator which would have reasonably been observed and disclosed in the course of such periodic evaluations, then the failure to provide such evaluations must be considered in the overall assessment of the sufficiency of the evidence to support cancellation of the contract. The stated purpose of the evaluation is to assist the administrator in overcoming deficiencies and to follow up with evaluations and assistance when deficiencies remain. To hide perceived deficiencies from an administrator by not conducting statutorily mandated evaluations and to then "spring" such deficiencies as grounds for cancellation under § 79–12,110 eviscerates the purpose of § 79–12,111.

In the context of this case, we agree with the school district that the budget matters were not something that could have reasonably been disclosed in the two periodic evaluations to which Boss was entitled during his first year as superintendent. However, we have already determined that the evidence is insufficient as a matter of law, i.e., that Boss would have been entitled to a directed verdict if this matter were tried to a jury, with regard to the charges of neglect of duty and incompetency on budget matters and Chapter 1 filings.

The charge of unprofessional conduct, however, is another matter. The failure of the district to provide Boss with periodic evaluations mandated under § 79–12,111 seriously impacts our assessment of the sufficiency of the evidence to support the charge of unprofessional conduct. The allegations with regard to Boss' conduct with Johnson, his treatment of female students, his relationship with Board member Long, and his dealings with parent grievances are the sort of potential "deficiencies" which should have reasonably been discovered and disclosed in periodic evaluations performed through the specified process anticipated by § 79–12,111. This was not done. Not only was Boss not afforded the assistance to correct deficiencies to which he was entitled, he was not even made aware that these were problems prior to the July 30 letter. Thus, for this additional reason, we conclude that the evidence, including the lack of

periodic evaluations, was insufficient to cancel Boss' contract on the grounds of unprofessional conduct.

## VI. CONCLUSION

If the case had been tried to a jury, Boss would have been entitled to a directed verdict with regard to claims that he neglected his duty or was incompetent to perform the duties of superintendent. As such, the evidence is insufficient as a matter of law to support cancellation of his contract on those grounds. Further, Boss, a probationary certificated employee, was statutorily entitled to two periodic evaluations during the first school year of his employment with the school district. These were not provided. Such evaluations should have disclosed, at least in theory, the deficiencies upon which the Board grounded its finding of Boss' unprofessional conduct. Boss was entitled to notification of such deficiencies and to assistance in correcting them. Whether they would have disclosed the difficulties which Johnson encountered in her relationship with Boss is unknown, since she never complained before the cancellation proceedings. In any event, he was denied the notice and the assistance to correct the deficiencies that the evaluation process is designed to uncover and remedy. The findings of the Board that Boss engaged in unprofessional conduct sufficient to cancel his contract were not supported by sufficient evidence. Thus, the decision to cancel Boss' employment contract was arbitrary and capricious. The decision of the district court affirming the Board's actions is reversed, and the matter is remanded to the district court with directions to enter a judgment in favor of Boss regarding the improper cancellation of his contract and with directions to undertake further proceedings not inconsistent with this opinion, including those necessary to address the damage, if any, sustained by Boss.

REVERSED AND REMANDED WITH DIRECTIONS.